**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, et al., Plaintiffs,**

v.

**Harold M. BROWN, et al., Defendants.**

**Civ. A. No. 78–2301.**

United States District Court, District of Columbia.

Nov. 20, 1979.

Mark D. Roth, James R. Rosa, Washington, D.C., for plaintiffs.

Barbara B. O'Malley, Keith M. Werhan, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

At issue in this case, as it likewise is in *National Federation of Federal Employees, Local 1622 v. Brown,* 481 F.Supp. 704 (D.D.C. 1979), a case that is also before the Court and in which a memorandum opinion and order is filed this day, is the question whether the 5.5 percent cap on salary increases imposed upon federal employees for the fiscal year 1979 should have been applied to the class of workers represented by plaintiffs.

The parties to this class action have come before the Court pursuant to cross-motions for summary judgment, each asserting that there exists no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Upon consideration of the parties' pleadings and the record as a whole, it appears this case is indeed ripe for disposition by summary judgment. Defendants' motion seeking such relief will be granted and the plaintiffs' motion denied.

### FACTS

Plaintiff union American Federation of Government Employees and the named individual plaintiffs represent the class consisting of those nonappropriated fund prevailing rate workers [1] employed during fiscal 1979 (October 1, 1978 through September 30, 1979) by the Department of Defense (DoD) and the Veterans Administration Canteen Service at various locations throughout the United States and in Guam. The wage rates and job gradings of the class of employees they represent are determined in accordance with the statutory scheme set forth in 5 U.S.C. §§ 5341–5349. More particularly, wage increases for this

---

1. Prevailing rate employees are federal employees who, like blue-collar workers in the private sector, are paid an hourly rate for their work. As defined by statute, these workers are engaged in trades or crafts or unskilled, semiskilled, or skilled manual labor. *See* 5 U.S.C. § 5342(a)(2) (1976). Certain of these workers are paid by funds appropriated by Congress. Others, the nonappropriated fund workers like the class represented by plaintiffs, are employed by so-called nonappropriated fund instrumentalities, such as those of the Department of Defense, that provide services in welfare and recreational programs for military personnel, their dependents, and authorized civilians. The funds used to pay these workers are not appropriated by Congress, but are received from other sources, mainly income generated by these service organizations.

class of workers are established by the procedures set out at 5 U.S.C.A. § 5343(a) (West Cum.Supp.1979), which in pertinent part provides:

The pay of prevailing rate employees shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates. . . . To carry out this subsection—

(1) the Office of Personnel Management shall define, as appropriate—[the individual local wage areas for prevailing rate employees]; . . .

(2) the Office of Personnel Management shall designate a lead agency for each wage area;

(3) . . . a lead agency shall conduct wage surveys, analyze wage survey data, and develop and establish appropriate wage schedules and rates for prevailing rate employees;

(4) the head of each agency having prevailing rate employees in a wage area shall apply to the prevailing rate employees of that agency in that area, the wage schedules and rates established by the lead agency, . . . for prevailing rate employees in that area . . . ..

Pursuant to section 5343(a), the Civil Service Commission, now the Office of Personnel Management (OPM)[2] defined approximately 145 individual wage areas and designated DoD as the lead agency for wage surveys to be conducted for nonappropriated fund employees in those wage areas. Acting in its capacity as lead agency, prior to October 24, 1978, DoD conducted wage surveys in various locales to determine the pay rates prevailing in the private sector for workers in the same trades and crafts as the members of the class plaintiffs represent. Thereafter, it analyzed the data gathered and developed wage schedules for the nonappropriated fund prevailing rate workers in the aforementioned wage areas. The schedules so developed suggested increases in basic pay rates for various groups of workers in excess of 5.5 percent. The effective date of the proposed increases was October 22, 1978. See 5 U.S.C. § 5344(a) (1976).

On October 24, 1978, President Carter requested in a nationally televised address on inflation that wage increases for all but the nation's lowest paid workers be limited to a maximum of seven percent. He further announced that a pay cap of 5.5 percent had already been placed on wage increases for federal employees for fiscal 1979.[3] By letter dated October 30, 1978, DoD requested advice from the Civil Service Commission concerning the impact of the President's anti-inflation program on wage schedules for nonappropriated fund prevailing rate workers, and it withheld issuance of the proposed schedules pending a reply to its request. On January 4, 1979, President Carter issued a memorandum to the heads of all executive departments and agencies in which he made a policy determination that the public interest required that no category of federal employees receive a pay increase exceeding 5.5 percent for fiscal 1979. He further issued a directive that nonappropriated fund workers were to be included under the 5.5 percent cap,[4] and

---

**2.** By virtue of the Civil Service Reform Act of 1978, effective January 11, 1979, the Civil Service Commission has been abolished and replaced, for purposes of this suit, by the Office of Personnel Management. See Pub.L.No. 95–454, 92 Stat. 1111 (to be codified in scattered sections of 5, 10, 15, 28, 31, 38, 39, 42 U.S.C.); Reorg. Plan No. 2 of 1978, 43 Fed.Reg. 36,037 (1978), reprinted in 5 U.S.C.A. § 1101 note, at 30 (West Cum.Supp.1979).

**3.** The pay cap to which President Carter referred was established by section 614(a) of the Treasury, Postal Service, and General Government Appropriations Act, 1979, Pub.L. No. 95–429, 92 Stat. 1001, which the President signed

into law on October 10, 1978. It covered only federal white collar personnel and blue-collar workers paid by appropriated funds.

**4.** In his memorandum, the President states:

[T]here are substantial numbers of nonappropriated fund employees and other workers employed by entities of the Federal Government who are not covered by Government-wide actions [limiting pay increases to 5.5 percent], since they are under a variety of relatively small pay systems over which [department and agency heads] have pay setting authority. In order to ensure that proposed pay increases for other pay systems do not exceed the maxi-

ordered the Chairman of the Civil Service Commission and his successor, the Director of OPM, to assist agency heads in complying with that policy.

On February 28, 1979, OPM issued a personnel bulletin applying to lead agencies responsible for establishing wage schedules pursuant to section 5343(a). Federal Personnel Manual Bulletin 532–31 (Feb. 28, 1978). According to the bulletin, wage schedules for nonappropriated fund workers having effective dates of October 1, 1978, through September 30, 1979, were directed to be paid unless they exceeded the previously scheduled wage rate by more than 5.5 percent. *Id.* Beginning that same day, DoD issued the wage schedules for the areas in which the class represented by plaintiffs are employed, none of which provided for a pay rate increase exceeding 5.5 percent. These increases were made retroactive to October 22, 1978, the effective date of the schedules.

In April 1979 President Carter authorized an exception to the 5.5 percent pay increase limitation for all nonappropriated fund employees earning less than $4.00 per hour. In an official bulletin issued April 20, 1979, OPM advised lead agencies that only the portion of a wage increase raising a worker's pay above $4.00 per hour was to be measured against the 5.5 percent limit. Federal Personnel Manual Bulletin 532–32 (Apr. 20, 1979). Employees exempted under this policy from the 5.5 percent limitation are to receive back pay from the effective date of their pay schedules (here, October 22, 1978) when revised schedules complying with this modification are issued.

■ As a result of these measures limiting wage increases for its members to 5.5 percent, plaintiffs brought this suit against Secretary of Defense Harold Brown, Office of Personnel Management Chairman Alan K. Campbell, and Max Cleland, head of the Veterans Administration, seeking mandamus relief under 28 U.S.C. § 1361 and declarations that the defendants' failure to implement wage schedules authorizing increases in excess of 5.5 percent violates both the provisions of 5 U.S.C. §§ 5341–5349 and the fifth amendment due process rights of the class of workers they represent.[5]

In asserting that the defendants are required to implement the pay increases the wage surveys indicated were necessary to bring the wages of nonappropriated fund prevailing rate employees into line with those paid in the private sector, plaintiffs rely on three theories: first, upon completion of the DoD wage surveys pursuant to section 5343, the defendants were under a nondiscretionary duty to implement the results of those surveys and should now be compelled to do so by writ of mandamus pursuant to section 1361; second, even if the statutory scheme did grant discretion to modify the schedule resulting from the wage survey, the decision to implement the 5.5 percent pay cap was made arbitrarily

mums for Federal pay that the Congress and I have set, the Policy of this Administration is:
In the public interest to control inflation, each officer or employee in the executive branch who has administrative authority to set rates of pay for any Federal officers or employees should exercise such authority, to the extent permissible under law, treaty or international agreement, in such a way as to ensure that no rate of pay for any category of officers or employees is increased more than 5.5 percent during fiscal year 1979.
Memorandum for the Heads of Executive Departments and Agencies, Subject: Federal Pay and the Anti-Inflation Program, 15 Weekly Comp. of Pres.Doc. 8 (Jan. 4, 1979).

5. In their complaint, plaintiffs alleged that under 28 U.S.C. § 1331 and 28 U.S.C. § 1346 the Court has jurisdiction over this matter and can issue a declaratory judgment pursuant to 28 U.S.C. § 2201. Although plaintiffs' invocation of section 1331 appears to be inappropriate in that no individual in the class they represent has a claim amounting to $10,000 and their individual claims cannot be aggregated because the members of the class do not seek to enforce a single title or right in which they have a common and undivided interest, *see Zahn v. International Paper Co.,* 414 U.S. 291, 298–300, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *Snyder v. Harris,* 394 U.S. 332, 335–36, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), the Court nonetheless has jurisdiction to consider their claim for declaratory relief under section 1346, which gives federal district courts jurisdiction in cases against the United States with less than $10,000 in controversy.

and capriciously, and in a manner that abused the discretion afforded the executive; and third, on October 22, 1978, the effective date of the pay rates as mandated by section 5344 of title 5, the salary increases that were indicated by the wage surveys to be necessary to bring nonappropriated fund prevailing rate workers' wages up to the same level as those of the private sector employees became vested, so that the determination not to implement such increases was a violation of the statutory scheme and of the constitutional rights of the nonappropriated fund prevailing rate employees who were to receive those raises.

■ Plaintiffs' initial contention that the defendants have a nondiscretionary duty to implement the wage increases suggested by the DoD surveys is identical to the argument put forth by the plaintiff in *National Federation of Federal Employees, Local 1622 v. Brown.* In that case, this Court declared:

> The plain language of both statutes cited by plaintiff states that adjustments to increase wage schedules of prevailing rate government workers are to be made "as nearly as is consistent with the public interest." 5 U.S.C. §§ 5341, 5343(a) (1976). The inclusion of these words in the statutes indicates that Congress did not intend that prevailing rate government workers automatically receive whatever the labor market in the private sector will bear, but rather that executive branch officials exercise discretion and make policy judgments to determine precisely what rates of wage increase would be wise in light of all relevant factors. Section 5343(a)(3) further permits the exercise of discretion through its language authorizing the lead agency to "*analyze* wage survey data, and develop and establish *appropriate* wage schedules and rates

for prevailing rate employees." (Emphasis supplied.) The lead agency is thus clearly directed to act as more than a conduit for the gathering of information. It is plain that the data received from the wage surveys is not meant to dictate the wage schedules ultimately established. Rather, the lead agency is to *study* the information obtained and determine to what extent the wage rates prevailing in the private sector can appropriately be applied to government workers. Once a decision has been made concerning what rates constitute proper increases, then the government agencies within the given wage area must apply the rates established by the lead agency.

481 F.Supp. 704, 707–08 (D.D.C.1979).

For the reasons set forth in that opinion, the Court finds that plaintiffs' first argument cannot prevail, thereby precluding the use of mandamus as relief for the injury they assert has been endured by the class of nonappropriated fund prevailing rate employees they represent.

■ As its second reason for urging the invalidity of the imposition of the 5.5 percent pay cap, plaintiffs argue that even if there was discretion to give a raise smaller than that indicated to be necessary by the data from the wage surveys, defendants nonetheless were arbitrary and capricious and abused their discretion in denying the wage increase in this instance. In so contending, plaintiffs do not assert that the decision to impose a pay cap of 5.5 percent was not one reasonably "consistent with the public interest," as the statutory scheme mandates it must be, 5 U.S.C. §§ 5341, 5343(a) (1976);[6] rather, they charge that the manner in which that policy decision was implemented amounted to an abuse of discretion. Specifically, they argue that the

---

6. Although the Court notes that the discretion authorized by the prevailing rate statute may sometimes be abused, as the United States Court of Claims found it had been in *Blaha v. United States*, 511 F.2d 1165, 1170–71 (Ct.Cl. 1975), it must agree with plaintiffs that such was not the case here. It is beyond dispute that "[t]he people of this country are experiencing a cruel period of economic inflation."

*AFL–CIO v. Kahn,* No. 79–1564 (D.C.Cir. June 22, 1979) (en banc) (Wright, C. J.), *cert. denied,* —— U.S. ——, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979), and in light of this reality of economic existence, the executive action imposing a pay cap was not an unreasonable method of seeking to deal with this critical problem "consistent with the public interest."

actions of DoD, as lead agency, and the Veterans Administration, as an agency applying the new schedules with the pay cap issued by DoD, were invalid in that neither agency in any way exercised its discretion by making an independent evaluation of whether the 5.5 percent ceiling could be imposed "consistent with the public interest."

In so arguing, plaintiffs in essence ask the Court to determine not only whose prerogative it was to exercise the discretion inherent in a finding that a given wage rate is "consistent with the public interest" but also whether that individual or entity indeed did so in this instance. Plaintiffs assert that the statute places the responsibility for any discretionary modification of the results of the wage survey only with the lead agency, here DoD, and with an agency, such as the Veterans Administration, that applies the wage schedule issued by the lead agency. In this instance, plaintiffs contend, it is obvious from defendant DoD's response to certain interrogatories that neither body made the proper findings prior to implementing the pay cap, but instead simply relied on the President's determination, as embodied in OPM's Federal Personnel Manual Bulletin 532–31, that it was consistent with the public interest that all salary increases be limited to 5.5 percent.[7]

 The Court is unable to agree with plaintiffs' analysis. As has already been pointed out in this case and in *National Federation of Federal Employees, Local 1622 v. Brown*, the opening passages of both section 5341 and section 5343 indicate the congressional desire that any wage schedule that is promulgated following a wage survey be "consistent with the public interest." Yet, an examination of the language of these two sections, and indeed, of the language of the entire enactment dealing with prevailing wage rate employees, fails to reveal any intent on the part of Congress to place within the hands of the lead agency or the agency applying the final wage schedule the sole authority for deciding what is "consistent with the public interest."

Congress clearly did preclude agencies, such as the Veterans Administration, that are charged with implementing the wage schedules issued by the lead agency from modifying those schedules by mandating such agencies "shall apply . . . the wage schedules and rates established by the lead agency." 5 U.S.C. § 5343(a)(4) (1976). In contrast, the lead agency is directed to "conduct wage surveys, analyze wage survey data, and *develop* and establish appropriate wage schedules and rates." 5 U.S.C. § 5343(a)(3) (1976) (emphasis supplied). While the statutory authorization to "develop" the appropriate wage schedules appears sufficiently broad to allow the lead agency to exercise its discretion to modify the results of the wage survey in arriving at a final wage schedule "consistent with the public interest," it neither specifically places the authority for making such a decision solely with the lead agency nor relieves the lead agency of the duty to follow the directions of any individual or entity possessing superior authority to make a policy decision with regard to what wage rate would be consistent with the public interest.

In this instance, putting aside the fact that DoD, as an executive department, normally would be required to implement any presidential policy directive absent some explicit, legally binding authority to the contrary, *see Myers v. United States*, 272 U.S. 52, 135, 164–65, 47 S.Ct. 21, 71 L.Ed. 160 (1926); 10 U.S.C. §§ 131, 133(b) (1976); W.

---

7. Defendant DoD's responses to plaintiffs' interrogatories, filed April 25, 1979, provided as follows:

 *INTERROGATORY NO. 6(a):* The President's Memorandum of January 4, 1979 only provided that pay increases for all Federal employees should be limited to 5.5 percent "to the extent permissible under law, treaty or international agreement." Did the Secretary of Defense or any of his subordinates make an independent finding that their March 1979 decision to cap *all* NAF employees pay at 5.5 percent was consistent with 5 U.S.C. § 5343 *et seq.*?

 *RESPONSE:* No. The Department acted pursuant to OPM Bulletin No. 532–31 (see Attachment B), which directed DoD to limit increases for nonappropriated fund employees covered by 5 U.S.C. § 5343 to 5.5 percent.

Gellhorn & C. Byse, *Administrative Law* 133 (6th ed. 1974); B. Schwartz, *Administrative Law* § 6, at 15–16 (1976), DoD was required by section 5343(a)(3) to follow any OPM regulations, such as Federal Personnel Manual Bulletin 532–31 prescribing "practices and procedures for . . . developing and establishing wage schedules and rates," 5 U.S.C. § 5343(c) (1976). As its answer to plaintiffs' interrogatories indicates, it did just that. *See* note 7 *supra*. Further, the OPM's decision to formulate such a regulation as a result of the President's directive was certainly a proper one, both in terms of OPM's responsibility to aid the President, as Chief Executive, in implementing his policy decision relating to the pay of federal civilian employees, *see* 5 U.S.C.A. § 1103 (West Cum.Supp.1979); see also Reorg.Plan No. 2 of 1978, § 104, 43 Fed. Reg. 36,037 (1978), *reprinted in* 5 U.S.C.A. § 1101 note, at 30 (West Cum.Supp.1979), and as a determination interpreting, within the framework of the statutory scheme OPM is to administer, which executive branch officials or agencies are authorized to decide what wage rates are "consistent with the public interest" and to what extent the standard established by the statute curtails the discretion granted, *see, e. g., Association of Bituminous Contractors v. Andrus,* 189 U.S.App.D.C. 75, 85, 581 F.2d 853, 863 (1978); *Kruse v. Hampton,* 394 F.Supp. 764, 769–70 (S.D.Ala.1974), *aff'd,* 513 F.2d 1231 (5th Cir. 1975) (per curiam); *Rogers v. Laird,* 319 F.Supp. 1, 4 (E.D.Va. 1970). Clearly, the implementation of the 5.5 percent pay cap by DoD and OPM was neither arbitrary nor capricious nor an abuse of discretion; rather, it was based upon sound, pragmatic, nondiscriminatory analysis and directive.

Plaintiffs' final challenge to the 5.5 percent pay cap involves the question of its retroactive application. In this regard they assert: 1) the refusal of the government to implement the results of DoD wage surveys on the wage increase's effective date, as set by section 5344 of title 5, violates the statutory scheme governing such increases, and 2) the class of workers plaintiffs represent had a "vested" right or interest in the pay

increases as revealed by the wage surveys such that denial of those increases was a violation of the fifth amendment's guarantee of due process.

■ As the defendants point out, plaintiffs' first argument is merely a reiteration, in somewhat different terms, of their contention that there is no agency discretion to implement any increase in variance with the results of the wage surveys. An analysis of the language of section 5344 indicates, however, that it does not in any way conflict with this Court's previous determination that there is no statutory entitlement to a raise in strict parity with the results of the wage survey.

■ In enacting the statutory scheme governing prevailing wage rate worker's salaries, the Congress sought to insure that those salaries were periodically reviewed and increased, if appropriate, by requiring OPM to conduct full-scale wage surveys every two years, with an interim survey to be held between each full-scale survey. *See* 5 U.S.C.A. § 5343(b) (West Cum.Supp.1979). At the same time, the lawmakers foresaw that circumstances might arise whereby the official issuance of the appropriate wage schedules following completion of the wage surveys would be delayed. To protect the workers in such an event, section 5344 provides in pertinent part:

(a) Each increase in rates of basic pay granted, pursuant to a wage survey, to prevailing rate employees is effective not later than the first day of the first pay period which begins on or after the 45th day, excluding Saturdays and Sundays, following the date the wage survey is ordered to be made.

(b) Retroactive pay is payable by reason of an increase in rates of basic pay referred to in subsection (a) of this section only when—

(1) the individual is in the service of the Government of the United States, including service in the armed forces, or the government of the District of Columbia on the date of the issuance of the order granting the increase; or

(2) the individual retired or died during the period beginning on the effective date of the increase and ending on the date of issuance of the order granting the increase, and only for services performed during that period.

5 U.S.C.A. § 5344 (West Cum.Supp.1979).

 In establishing this effective date, which is triggered by the beginning of the required wage surveys, and providing for retroactive pay to cover any wage increases due from the effective date to the date the increase is granted, Congress gave no indication that the increases must be identical to those proposed solely as a result of the wage surveys. While the enactment speaks in subsection (a) of the increase as that "granted, pursuant to a wage survey," this ambiguous reference to the wage surveys is clarified in subsection (b), which speaks not of the wage surveys but provides for retroactive pay from the effective date to "the date of the *issuance of the order granting the increase.*" (Emphasis added.) This formal order, not simply the results of the wage survey, is to govern what increase is finally paid and that order, consistent with the statutory language granting the executive discretion in setting a wage increase, is to be based upon the results of the wage survey *and* upon any modifications in those results that are necessary to make the new wage schedules "consistent with the public interest." Plaintiffs' contention in this regard is thus without merit.[8]

 Finally, in asserting that the class they represent are being deprived of some "vested" right or interest requiring constitutional protection, plaintiffs likewise meet with no success. There is no doubt, as the parties readily agree, that under the fifth amendment a right or property interest, once vested, is entitled to protection from unrestrained governmental action that would denigate or destroy it. *See, e. g., Board of Regents v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). The parties disagree, however, as to the fundamental question of whether such an interest exists here.

In *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709, the Supreme Court defined the parameters of a protected interest as follows:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . .
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Relying on this analysis, plaintiffs assert that the "right" of nonappropriated fund prevailing rate employees to a wage increase on a par with the wage surveys is elevated to the level of a protected property right by reason of the supposed trend toward treating the relationship between the federal government and its employees as one that is quasi-contractual.

 The Court is hard-pressed to see the trend to which plaintiffs allude. In

---

8. Plaintiffs also assert that to interpret section 5344 in this manner will, in effect, give the government carte blanche to deny a wage increase simply by not issuing an order establishing a new wage schedule with higher wage rates. Such an argument is without merit, for although the statute itself establishes no time limits within which a new wage schedule must be issued, the statute clearly does impose a duty to do so, *see* 5 U.S.C. § 5343(a)(3) (1976), which would be subject to the requirement that it be performed in a reasonable period of time.

Further, while the discretion granted to the executive by Congress to promulgate new wage schedules "consistent with the public interest" is broad, that discretion must necessarily be exercised within limits to the extent that it cannot be used to frustrate completely the congressional purposes, as defined in 5 U.S.C. § 5341 (1976), in enacting the statutory scheme that governs the wages of prevailing rate employees. *See Blaha v. United States,* 511 F.2d 1165, 1170 (Ct.Cl.1975).

fact, it is apparent that just as there is no entitlement to continued employment, absent a specific contractual agreement or an established institutional policy or practice, *see Perry v. Sindermann*, 408 U.S. 593, 602–03, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth, supra*, 408 U.S. at 577–78, 92 S.Ct. 2701, or to a promotion, *see Colm v. Vance*, 186 U.S.App.D.C. 132, 137, 567 F.2d 1125, 1130 (1977), so too there is no vested right to a pay raise or a particular level of pay increase absent some statutory entitlement, *see Baratt v. United States*, 585 F.2d 1041, 1048–49 (Ct.Cl.1978); *Gilliam v. City of Omaha*, 388 F.Supp. 842, 850 (D.Neb.), *aff'd*, 524 F.2d 1013 (8th Cir. 1975); *cf. United States v. Larionoff*, 431 U.S. 864, 869, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977) (soldier's entitlement to pay dependent on statutory right). In this instance, the only entitlement of the class represented by plaintiffs was to receive any pay raise, retroactive to the effective date of the increase as provided by statute, that was granted by order of the responsible lead agency following consideration of the applicable wage survey and the executive's determination as to the extent to which the proposed wage increase would be "consistent with the public interest." Only at the

time that final order is issued by the lead agency implementing the new wage schedules is there any right to a salary increase sufficient to merit consideration as being constitutionally protected.[9]

Accordingly, the plaintiffs' motion for summary judgment will be denied and summary judgment granted in favor of the defendants.

An appropriate order is entered herein and this action is dismissed.

---

**9.** Plaintiffs also cite a recent decision in this jurisdiction, *American Federation of Government Employees v. Campbell*, 474 F.Supp. 357 (D.D.C.1979), *appeals docketed*, Nos. 79–2024 & 79–2136 (D.C. Cir. Aug. 31, 1979 & Sept. 25, 1979), as support for their assertion that nonappropriated fund prevailing rate workers are entitled to wage rate increases above the 5.5 percent cap established by the lead agency. In *Campbell*, the court considered the application of the statutory 5.5 percent pay cap instituted by Public Law 95–429 to certain prevailing rate appropriated fund federal employees whose pay rates are determined pursuant to section 5343. The effective dates of the wage schedules in question were October 1 and October 8, 1979. The Civil Service Commission had determined that the pay cap legislation, which was signed into law on October 10, 1978, was retroactively applicable to pay increases having effective dates between October 1 and October 10, 1978. *Id.* at 358–59. The court held that the statute could not be applied retroactively to limit wages increases payable during the period October 1–10, 1978, but could be applied to limit remuneration for services performed on or after October 10. *Id.* at 359–60.

This Court does not find the *Campbell* decision determinative since its holding addresses an issue that is irrelevant here—namely, the effect of retroactive application of Public Law 95–429. The class plaintiffs are not subject to that legislation. It also is unclear from *Campbell* whether the defendants in that case had actually promulgated wage schedules establishing rates of increase in excess of 5.5 percent prior to the effective date of Public Law 95–429. *See id.* at 358. In the instant case, DoD withheld issuance of the wage schedules until February 1979, and then paid wage increases retroactively. The Court finds this difference crucial. Moreover, were *Campbell* to be read to hold that section 5343(a) establishes a vested statutory right in prevailing rate workers to receive pay increases precisely equal to the rates prevailing in the private sector and a concomitant duty on the part of the lead agency to issue schedules reflecting absolute parity, this would, in effect, remove the discretionary language from section 5343(a). *Campbell* will stand on its own facts; the instant case will rest on its own bases.