NATIONAL FEDERATION OF
FEDERAL EMPLOYEES,
LOCAL 1622, Plaintiff,

v.

Harold M. BROWN, Individually and as
Secretary of Defense, and the Depart-
ment of Defense, Defendants.

Civ. A. No. 78–2252.

United States District Court,
District of Columbia.

Nov. 20, 1979.

George Tilton, Washington, D. C., for plaintiff.

Barbara B. O'Malley, Keith M. Werhan, U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

At issue in this case, as it likewise is in the related case of *American Federation of Government Employees v. Brown,* 481 F.Supp. 711 (D.D.C. 1979), a case that is also before the Court and in which a memorandum opinion and order is also filed this day, is the question whether the 5.5 percent cap on salary increases imposed upon federal employees for the fiscal year 1979 should have been applied to the workers represented by plaintiff union.

Procedurally, this matter comes before the Court on the parties' cross-motions for summary judgment. Each party contends that there exists no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Clearly, disposition by summary judgment is appropriate in this case. After a thorough review of the pleadings and consideration of the oral argument of counsel, plaintiff's motion must be denied and summary judgment granted in favor of defendants.

## FACTS

Plaintiff union represents on an exclusive basis certain nonappropriated fund prevailing rate workers [1] employed by the Department of Defense in the wage area consisting of the counties of Alexandria, Arlington, and Fairfax, Virginia. The wage rates and job grading applicable to its members are determined in accordance with the statutory scheme set forth in 5 U.S.C. §§ 5341–5349. More particularly, wage increases are established by the procedures set out at 5 U.S.C.A. § 5343(a) (West Cum.Supp.1979), which provides in pertinent part:

The pay of prevailing rate employees shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates. . . . To carry out this subsection—

(1) the Office of Personnel Management shall define, as appropriate— [the individual local wage areas for prevailing rate employees]; . . .

(2) the Office of Personnel Management shall designate a lead agency for each wage area;

(3) . . . a lead agency shall conduct wage surveys, analyze wage survey data, and develop and establish appropriate wage schedules and rates for prevailing rate employees;

(4) The head of each agency having prevailing rate employees in a wage area shall apply to the prevailing rate employees of that agency in that area, the wage schedules and rates established by the lead agency, . . . for prevailing rate employees in that area . . ..

Pursuant to section 5343(a)(2), the Civil Service Commission, now the Office of Personnel Management (OPM),[2] designated defendant Department of Defense (DoD) as

---

1. Prevailing rate employees are federal employees who, like blue-collar workers in the private sector, are paid an hourly rate for their work. As defined by statute, these workers are engaged in trades or crafts or unskilled, semiskilled, or skilled manual labor. *See* 5 U.S.C. § 5342(a)(2) (1976). Certain of these workers are paid by funds appropriated by Congress. Others, the nonappropriated fund workers like plaintiff's members, are employed by so-called nonappropriated fund instrumentalities, such as those of the Department of Defense, that provide services in welfare and recreational programs for military personnel, their dependents, and authorized civilians. The funds used to pay these workers are not appropriated by Congress, but are received from other sources, mainly income generated by these service organizations.

2. By virtue of the Civil Service Reform Act of 1978, effective January 11, 1979, the Civil Service Commission has been abolished and replaced, for purposes of this suit, by the Office of Personnel Management (OPM). *See* Pub.L. No. 95–454, 92 Stat. 1111 (to be codified in scattered sections of 5, 10, 15, 28, 31, 38, 39, 42 U.S.C.); Reorg. Plan No. 2 of 1978, 43 Fed.Reg. 36,037 (1978), *reprinted in* 5 U.S.C.A. § 1101 note, at 30 (West Cum.Supp.1979).

the lead agency for wage surveys to be conducted for nonappropriated fund employees in the Alexandria-Arlington-Fairfax, Virginia wage area. Acting in this capacity, DoD conducted a wage survey during the period August 15 to September 29, 1978, to determine the pay rates prevailing in the private sector for workers in the same trades and crafts as plaintiff's members. Thereafter, it analyzed the data gathered and developed wage schedules for the nonappropriated fund prevailing rate workers in the aforementioned wage area. The schedules so developed suggested increases in basic pay rates for various groups of workers ranging from 6.5 percent to 8.9 percent. The effective date of the proposed increases was October 22, 1978.[3] *See* 5 U.S.C. § 5344(a) (1976).

On October 24, 1978, President Carter requested in a nationally televised address on inflation that wage increases for all but the nation's lowest paid workers be limited to a maximum of seven percent. He further announced that a pay cap of 5.5 percent had already been placed on wage increases for federal employees for fiscal 1979.[4] By letter dated October 30, 1978, DoD requested advice from the Civil Service Commission concerning the impact of the President's anti-inflation program on its proposed wage schedules for nonappropriated fund prevailing rate workers, and it withheld issuance of the schedules pending a reply to its request. On January 4, 1979, President Carter issued a memorandum to the heads of all executive departments and agencies in which he made a policy determination that the public interest required that no category of federal employees receive a pay increase exceeding 5.5 percent for fiscal 1979. He further issued a directive that nonappropriated fund workers were to be included under the 5.5 percent cap,[5] and ordered the Chairman of the Civil Service Commission and his successor, the Director of OPM, to assist agency heads in complying with that policy.

On February 28, 1979, OPM issued a personnel bulletin applying to lead agencies responsible for establishing wage schedules pursuant to section 5343(a). Federal Personnel Manual Bulletin 532–31 (Feb. 28,

---

3. The statutory scheme governing pay increases for nonappropriated fund workers requires OPM to conduct full-scale wage surveys every two years, with an interim survey to be held between each full-scale survey, 5 U.S.C.A. § 5343(b) (West Cum.Supp.1979), and provides for an effective date for any increase granted after study of the wage surveys, which is to be "the first day of the first pay period which begins on or after the 45th day, excluding Saturdays and Sundays, following the date the wage survey is ordered to be made," *id.* § 5344(a). If this effective date is not the date upon which the new wage schedule is officially issued, Congress has provided that retroactive pay shall be given to qualified workers from the effective date to "the date of issuance of the order granting the increase." *Id.* § 5344(b)(1)–(2). For further discussion of these retroactive pay provisions see *American Fed'n of Gov't Employees v. Brown*, 481 F.Supp. 711, 718–19 (D.D.C. 1979).

4. The pay cap to which President Carter referred was established by section 614(a) of the Treasury, Postal Service, and General Government Appropriations Act, 1979, Pub.L. No. 95–429, 92 Stat. 1018, which the President signed into law on October 10, 1978. It covered only federal white collar personnel and blue-collar workers paid by appropriated funds.

5. In his memorandum, the President stated:

[T]here are substantial numbers of nonappropriated fund employees and other workers employed by entities of the Federal Government who are not covered by Governmentwide actions [limiting pay increases to 5.5 percent], since they are under a variety of relatively small pay systems over which [department and agency heads] have pay setting authority. In order to ensure that proposed pay increases for other pay systems do not exceed the maximums for Federal pay that the Congress and I have set, the Policy of this Administration is:

In the public interest to control inflation, each officer or employee in the executive branch who has administrative authority to set rates of pay for any Federal officers or employees should exercise such authority, to the extent permissible under law, treaty, or international agreement, in such a way as to ensure that no rate of pay for any category of officers or employees is increased more than 5.5 percent during fiscal year 1979.

Memorandum for the Heads of Executive Departments and Agencies, Subject: General Pay and the Anti-Inflation Program, 15 Weekly Comp. of Pres. Doc. 8 (Jan. 4, 1979).

1978). According to the bulletin, wage schedules for nonappropriated fund workers having effective dates of October 1, 1978, through September 30, 1979, were directed to be paid unless they exceeded the previously scheduled wage rate by more than 5.5 percent. *Id.* In such an event, lead agencies were instructed to establish a 5.5 percent maximum increase. *Id.* On the same day, DoD issued the wage schedules for the Arlington-Alexandria-Fairfax wage area, none of which provided for a pay rate increase exceeding 5.5 percent. These increases were made retroactive to October 22, 1978, the effective date of the schedules. See note 3 *supra.*

In April 1979 President Carter authorized an exception to the 5.5 percent pay increase limitation for all nonappropriated fund employees earning less than $4.00 per hour. In an official bulletin issued April 20, 1979, OPM advised lead agencies that only the portion of a wage increase raising a worker's pay above $4.00 per hour was to be measured against the 5.5 percent limit. Federal Personnel Manual Bulletin 532–32 (Apr. 20, 1979). Employees exempted under this policy from the 5.5 percent limitation were to receive back pay from the effective date of their pay schedules (here, October 22, 1978) when revised schedules complying with this modification were issued.

As a result of these measures limiting wage increases for its members to 5.5 percent, plaintiff has brought this suit against Secretary of Defense Harold M. Brown and DoD seeking mandamus relief under 28 U.S.C. § 1361.[6] It challenges defendants' failure to implement wage schedules authorizing increases in excess of 5.5 percent, which the original data gathered by DoD in its capacity as lead agency indicated were necessary to bring the pay of its members into line with the salaries of similar workers in the private sector.

## DISCUSSION

The sole issue to be decided in this action is whether defendants are required by the statutory scheme of section 5343(a) to issue and implement wage schedules for nonappropriated fund prevailing rate workers that would make such employees salaries equal to those paid in the private sector. Plaintiff argues strenuously that they are so required citing both the policy statement of 5 U.S.C. § 5341, which indicates a congressional preference that wage rates for the government's prevailing rate employees be in line with those paid in the private sector, and section 5343(a)(4), which requires the application by executive agency employers of the wage schedules established by the lead agency. Since implementation of the wage schedules is a ministerial act, plaintiff contends, mandamus will lie to require defendants to apply wage schedules reflecting rate increases in excess of 5.5 percent. In contrast, defendants argue that section 5343(a) vests discretion in the executive branch to determine whether wage increases equal to those in the private sector are consistent with the public interest. They assert that they have fully complied with the statutory mandate in that DoD, acting as lead agency, has conducted a wage survey, analyzed the data, and developed wage schedules taking into account both the data gathered by the survey and the President's policy determination of the public interest, and that DoD, acting as an executive agency employer, has applied the schedules to its prevailing rate nonappropriated fund employees effective October 22, 1978.

■ The Court concludes that plaintiff's argument is doomed from the very outset. The plain language of both statutes cited by plaintiff states that adjustments to increase

**6.** In its complaint, plaintiff also alleged jurisdiction under 28 U.S.C. § 1331. Since no individual member of the union can assert a claim in an amount that exceeds the jurisdictional requirement of $10,000 in controversy, plaintiff no longer contends that jurisdiction lies under section 1331. *See Zahn v. International Paper Co.,* 414 U.S. 291, 293–95, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); *Snyder v. Harris,* 394 U.S. 332, 334–35, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969); *National Treasury Employees Union v. Nixon,* 160 U.S.App.D.C. 321, 326, 492 F.2d 587, 592 (1974).

wage schedules of prevailing rate government workers are to be made "as nearly as is consistent with the public interest." 5 U.S.C. §§ 5341, 5343(a) (1976). The inclusion of these words in the statutes indicates that Congress did not intend that prevailing rate government workers automatically receive whatever the labor market in the private sector will bear, but rather that executive branch officials exercise discretion and make policy judgments to determine precisely what rates of wage increase would be wise in light of all relevant factors. Section 5343(a)(3) further permits the exercise of discretion through its language authorizing the lead agency to "*analyze* wage survey data, and develop and establish *appropriate* wage schedules and rates for prevailing rate employees." (Emphasis supplied.) The lead agency is thus clearly directed to act as more than a conduit for the gathering of information. It is plain that the data received from the wage surveys is not meant to dictate the wage schedules ultimately established. Rather, the lead agency is to *study* the information obtained and determine to what extent the wage rates prevailing in the private sector can appropriately be applied to government workers. Once a decision has been made concerning what rates constitute proper increases, then the government agencies within the given wage area must apply the rates established by the lead agency. All of this was done in the instant case.

Plaintiff would have the Court ignore the operative discretionary language of the statutes and instead look to what it insists are indications in the legislative history that Congress intended to prevent the operation of executive discretion in the setting of wage rates for employees covered by the statutory scheme at issue here. "When confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning." *TVA v. Hill*, 437 U.S. 153, 184 n.29, 98 S.Ct. 2279, 2296, 57 L.Ed.2d 117 (1978); *see Ex parte Collett*, 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949). Even were the Court to do so, however, the sources on which plaintiff chiefly relies do not, when reviewed in their entirety, indicate that Congress was concerned with entirely eliminating discretion in the executive branch in setting wage scales. On the contrary, the congressional debates cited by plaintiff show that the intent behind the legislation at issue here was to create a coordinated system under which wage scales and job grading could be established and of which nonappropriated fund workers would be made a part. *See* 118 Cong.Rec. 21018–21032 (1972) (Senate debate); 117 Cong.Rec. 27679–27693 (1972) (House of Representatives debate).

It is significant to note that in passing sections 5341 and 5343(a) in 1972, Congress retained the language "as nearly as is consistent with the public interest," which, when used in prevailing rate statutes, has been repeatedly interpreted by the courts as vesting discretion in the executive branch to determine appropriate wage rates. *See, e. g., Rogers v. Laird*, 319 F.Supp. 1, 4 (E.D.Va.1970); *Baratt v. United States*, 585 F.2d 1041, 1045 (Ct.Cl.1978); *Daigle v. United States*, No. 264–76, slip op. at 6–9 (Ct.Cl. July 14, 1978). Indeed, this "operative language . . . has remained unchanged since its enactment as part of the Classification Act of 1949, ch. 782, § 202(7), 63 Stat. 955." *Baratt v. United States, supra*, 585 F.2d at 1045; *see Blaha v. United States*, 511 F.2d 1165, 1166 (Ct.Cl.1975). The Court of Claims has observed in interpreting a prevailing rate statute drafted to include these words that "[i]t is [the executive branch's] responsibility to determine how closely the salaries of the specified personnel can parallel the . . . industry's rates and still be 'consistent with the public interest.'" *Daniels v. United States*, 407 F.2d 1345, 1347, 187 Ct.Cl. 38 (1969).

Nonetheless, plaintiff would have this Court adopt the reasoning that the language "as nearly as is consistent with the public interest" is merely introductory and adds nothing to the statute. Such an interpretation would not only fly in the face of precedent, but would also violate the well-known principle of statutory construction that all words in a statute are to be

assigned a meaning and are not to be considered mere surplusage. *E. g., Association of Bituminous Contractors v. Andrus,* 189 U.S.App.D.C. 75, 84 & n.22, 581 F.2d 853, 862 & n.22 (1978); *Zeigler Coal Co. v. Kleppe,* 175 U.S.App.D.C. 371, 379, 536 F.2d 398, 406 (1976); *Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 135, 479 F.2d 842, 856, *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). It is clear that the statutory scheme vests discretion in the executive branch to make an ultimate determination concerning whether it is appropriate to establish wage schedules that precisely parallel those prevailing in the private sector. Although the government properly could have adopted the pay practices generally prevailing in the private sector as determined by its survey, and indeed "is encouraged to adopt industry practices if they are 'consistent with the public interest . . ., within its discretion, [the government] is also entitled to invoke the public interest clause." *Daigle v. United States, supra,* No. 264–76, slip op. at 8–9. The latter course was chosen by the executive branch in this instance.[7]

■ As an alternative position, plaintiff contends that Congress' passage of section 614(a) of the Treasury, Postal Service, and General Government Appropriations Act, 1979, Pub.L. No. 95–429, 92 Stat. 1001 (1978), suggests congressional intent that nonappropriated fund prevailing rate employees be exempted from the 5.5 percent pay cap. The statute provided that no funds appropriated for fiscal 1979 can be used to pay salary increases exceeding by more than 5.5 percent the salary rates effective in fiscal 1978 for federal white collar personnel or blue-collar prevailing rate workers paid by appropriated funds. It is totally silent, however, regarding wage increases for nonappropriated fund prevailing workers, such as plaintiff's members. As

support for his argument, plaintiff relies upon statements in the legislative history of the statute indicating that the intent of the legislation's supporters was to apportion equally among all federal workers the burden of wage limitations imposed as a result of the government's anti-inflation program. *See* 124 Cong.Rec. S9866, S9868 (daily ed. June 27, 1978) (remarks of Sens. Eagleton and Percy). Plaintiff asserts that since the stated objective of the legislation was to equalize this burden and since the only group of prevailing rate workers specifically covered is that defined by 5 U.S.C. § 5342(a)(2)(A), who are workers paid by appropriated funds, Congress presumably intended that employees paid with nonappropriated funds not be subjected to the pay cap.

■ By offering this argument, plaintiff apparently seeks to find support in the maxim *expressio unius est exclusio alterius.* The doctrine is of limited utility to plaintiff in the instant case, however. Although plaintiff has not clearly articulated what direct effect, if any, the passage of Public Law 95–429 has upon section 5343(a) and its grant of discretion to the lead agency, there seem to be two possible challenges plaintiff may be making. First, plaintiff could be contending that DoD's capping of wage schedules of nonappropriated fund employees in the face of the silence of Public Law 95–429 regarding this group is an arbitrary and capricious action. Plaintiff, however, has waived this argument by its representation to the Court, upon precise inquiry, that it does not challenge defendants' actions as arbitrary and capricious. See note 7 *supra.* The second possible argument appears to be that in some way Public Law 95–429 impliedly repeals section 5343(a). In considering such an assertion, it is necessary to remember "the 'cardinal rule . . . that repeals by implication are not fa-

---

7. . While the government's action in setting the 5.5 percent pay limit might be challenged as arbitrary and capricious, plaintiff has consistently represented to the Court that it does not do so, preferring to rely on its position that defendants are required by statute to apply wage schedules that directly reflect the pay

scales found by the wage survey to prevail in the private sector. Even if the issue had been raised, however, it seems apparent that it would be unlikely to prevail. *See American Fed'n of Gov't Employees v. Brown,* 481 F.Supp. 711, 716 n. 6 (D.D.C. 1979).

vored.'" *Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (quoting *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 80 L.Ed. 351 (1936)). The Supreme Court has repeatedly stated that the legislature's intent to repeal must be manifest. *See, e. g., TVA v. Hill, supra,* 437 U.S. at 153, 98 S.Ct. 2279; *Georgia v. Pennsylvania Railroad,* 324 U.S. 439, 456–57, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); *Posadas v. National City Bank, supra,* 296 U.S. at 503, 56 S.Ct. 349. Public Law 95–429 gives no indication, much less a clear statement, of intent to repeal section 5343(a). Moreover,

> [t]he doctrine disfavoring repeals by implication "applies with full vigor when . . . the subsequent legislation is an *appropriations* measure." *Committee for Nuclear Responsibility v. Seaborg,* 149 U.S.App.D.C. 380, 382, 463 F.2d 783, 785 (1971) (emphasis added) . . . . This is perhaps an understatement since it would be more accurate to say that the policy applies with even *greater* force when the claimed repeal rests solely on an appropriations act.

*TVA v. Hill, supra,* 437 U.S. at 190, 98 S.Ct. at 2299 (emphasis in original). Plaintiff here would seem to be requesting the Court to find an implied repeal by virtue of congressional silence in an appropriations act. Given the strong presumptions against such repeals and particularly in view of the consideration of the instant case, the Court cannot find that the passage of Public Law 95–429 in any way invalidates DoD's exercise of discretion as lead agency in capping the wage schedules of plaintiff's members.

Finally, the Court notes that plaintiff places considerable reliance on two decisions from this jurisdiction, *National Treasury Employees Union v. Nixon,* 160 U.S.App. D.C. 321, 492 F.2d 587 (1974), and *American Federation of Government Employees v. Campbell,* 474 F.Supp. 357 (D.D.C.1979), *appeals docketed,* Nos. 79–2024 & 79–2136 (D.C.Cir. Aug. 31, 1979 & Sept. 25, 1979), as support for its assertion that its members are entitled to wage rate increases above the 5.5 percent pay cap established by the lead agency. Both cases, however, are inapposite to the situation present here.

*National Treasury Employees Union* involved an interpretation of the effect of a 1971 amendment to the Economic Stabilization Act Amendments of 1971, Pub.L. No. 92–210, § 3, 85 Stat. 743, upon the Federal Pay Comparability Act, 5 U.S.C. §§ 5301–5308 (1970). Under the Federal Pay Comparability Act, by October 1 of each year the President was required to adjust the pay rates of various federal employees other than prevailing rate workers to a level consistent with private industry unless by September 1, upon a finding of national emergency or economic conditions affecting the general welfare, he submitted an alternative plan to Congress and it did not veto the plan within thirty days. Following the passage in 1971 of certain amendments to the Economic Stabilization Act, the President asserted that the amendments would defer the pay raise due on October 1, 1972, until January 1, 1973, and therefore declined either to institute the October 1 salary increase or to file an alternative plan with Congress. 160 U.S.App.D.C. at 329–30, 492 F.2d at 595–96. The court held that the provisions of the Federal Pay Comparability Act controlled such that, in the absence of the submission of an alternative plan to Congress within the time prescribed, the President had a nondiscretionary duty to adjust the pay rates of federal workers on October 1. *Id.* at 334–35, 492 F.2d at 600–01. Clearly, the differences in the statutory scheme involved in that case render it of no value as precedent here.

In *Campbell,* the court considered the application of the statutory 5.5 percent pay cap instituted by Public Law 95–429 to certain prevailing rate appropriated fund federal employees whose pay rates are determined pursuant to section 5343. The effective dates of the wage schedules in question were October 1 and October 8, 1979. The Civil Service Commission had determined that the pay cap legislation, which was signed into law on October 10, 1978, was retroactively applicable to pay increases having effective dates between October 1 and October 10, 1978. 474 F.Supp. at 358–

59. The court held that the statute could not be applied retroactively to limit wage increases payable during the period October 1–10, 1978, but could be applied to limit remuneration for services performed on or after October 10. *Id.* at 359–60.

The Court does not find the *Campbell* decision determinative. Its holding addresses an issue irrelevant here—namely, the effect of retroactive application of Public Law 95–429. Plaintiff's membership is not subject to that legislation. The validity of the pay cap in contention here rests solely on the determination whether defendant DoD, acting as a duly designated lead agency, could legitimately establish wage schedules that did not precisely parallel the wage rates prevailing in the private sector. In its discussion of this question earlier in this opinion, the Court has held that section 5343(a) grants such discretion to the lead agency.

. Accordingly, plaintiff's motion for summary judgment must be denied and summary judgment granted in favor of defendants.

An appropriate order is entered herein and this action is dismissed.