645 F.2d 1017
 24 Wage & Hour Cas. (BN 1209, 25 Wage & Hour
Cas. (BN 142,
207 U.S.App.D.C. 92
 NATIONAL FEDERATION OF FEDERAL EMPLOYEES, LOCAL 1622, Appellant,
v.
Harold M. BROWN, Individually and As Secretary of Defense,
and The Department of Defense, Appellees.
AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, et
al., Appellants,
v.
Harold M. BROWN, Secretary of Defense, et al., Appellees.
 Nos. 79-2394, 80-1092.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 29, 1980.
Decided Feb. 18, 1981.
As Amended April 1, 1981.
 
 Appeal from the United States District Court for the District of Columbia (Civil Action Nos. 78-2252, 78-2301).
 Catherine Waelder, Washington, D. C., with whom Janet Cooper, Washington, D. C., was on brief, for appellant. Bruce P. Heppen, Washington, D. C., also entered an appearance for appellant in No. 79-2394.
 Mark D. Roth, Washington, D. C., with whom James R. Rosa, Washington, D. C., was on brief, for appellants in No. 80-1092.
 Marc Richman, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Robert S. Greenspan, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellees.
 Before ROBB, EDWARDS and GINSBURG, Circuit Judges.
 Opinion for the court filed by Circuit Judge GINSBURG.
 Dissenting opinion filed by Circuit Judge ROBB.
 GINSBURG, Circuit Judge:
 
 
 1
 These cases are companion to American Federation of Government Employees v. Campbell, No. 79-2024 (D.C. Cir. December 18, 1980); they present the question whether the Secretary of Defense properly imposed a 5.5% cap for fiscal year 1979 on the pay increases of members of the class represented by plaintiff-appellants. American Federation of Government Employees v. Campbell involved federal blue-collar workers, designated "prevailing rate employees,"[1] who are paid by funds appropriated by Congress. The cases we now decide also involve federal blue-collar, prevailing rate employees. However, the workers in the instant cases are not paid with funds appropriated by Congress. Called "nonappropriated fund workers," they are paid with funds from other sources, mainly income generated by the organizations they serve.[2]
 
 
 2
 In American Federation of Government Employees v. Campbell, we held that in an appropriations bill signed by the President on October 10, 1978,[3] Congress effectively capped at 5.5% the fiscal year 1979 pay increases of prevailing rate employees paid with appropriated funds. That enactment, all parties agree, does not encompass nonappropriated fund workers. Nonetheless, the district court held that the Secretary of Defense properly imposed the same 5.5% cap pursuant to the administration's announced anti-inflation program.[4] Authority for executive imposition of the cap was found in the relevant "public interest" clauses of the "prevailing rate statute."[5]
 
 
 3
 We conclude that the "public interest" clauses do not bear the weight the district court placed on them. Rather, we believe that executive discretion to fix and adjust pay rates for members of the class herein is circumscribed by the principles Congress enumerated in 5 U.S.C. § 5341 (1976): (1) equal pay for equal work in all federal agencies within the same locality; (2) differences in pay for substantial differences in duties, responsibilities, and qualification requirements; (3) rates of pay maintained in line with rates paid locally for comparable work in the private sector; (4) rates of pay maintained at a level that attracts and retains qualified employees. If other principles are to augment, modify, or supplant this list, Congress must supply the authorization. We therefore reverse the judgments entered for the defendants and remand for further proceedings consistent with the pay-setting guidelines Congress has established. As we explain below, the 5.5% pay cap for nonappropriated fund workers might be justified under the first principle Congress supplied, equal pay for equal work in all federal agencies within the same locality. But the executive action at issue must be tied to a legislative direction giving content to the words "public interest." Congress did not authorize the executive to go outside its guidelines and attribute to those words any nonarbitrary meaning the President finds consonant with the nation's welfare.
 
 I.
 
 4
 In these two cases, considered separately below and consolidated on appeal, plaintiff-appellants are two unions and two individuals; they represent a class of some 100,000 nonappropriated fund blue-collar workers employed by instrumentalities of the Department of Defense and Veterans Administration. The pay rates of the class herein are governed by 5 U.S.C. §§ 5341-5349 (1976 & Supp. III 1979) (the "prevailing rate statute"). Congressional policy for prevailing rate pay systems is set out in § 5341:
 
 
 5
 It is the policy of Congress that rates of pay of prevailing rate employees be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and be based on principles that
 
 
 6
 (1) there will be equal pay for substantially equal work for all prevailing rate employees who are working under similar conditions of employment in all agencies within the same local wage area;
 
 
 7
 (2) there will be relative differences in pay within a local wage area when there are substantial or recognizable differences in duties, responsibilities, and qualification requirements among positions;
 
 
 8
 (3) the level of rates of pay will be maintained in line with prevailing levels for comparable work within a local wage area; and
 
 
 9
 (4) the level of rates of pay will be maintained so as to attract and retain qualified prevailing rate employees.
 
 
 10
 Section 5343 of the prevailing rate statute repeats the general policy that "wages shall be adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates" and establishes a mechanism to carry out the policy. The Office of Personnel Management (OPM) defines relevant (geographical) wage areas and designates a "lead agency" for each area; the lead agency conducts a wage survey in the area, analyzes the data, and establishes "appropriate wage schedules and rates" for prevailing rate employees; all agencies with prevailing rate employees in the wage area must apply the rates established by the lead agency.
 
 
 11
 Pursuant to § 5343(a)(2), OPM's predecessor, the Civil Service Commission, defined approximately 145 wage areas and designated the Department of Defense as the lead agency for nonappropriated fund workers in the defined areas. In August and September of 1978, the Department conducted wage surveys to determine the pay rates prevailing in the private sector for workers in the same trades and crafts as members of the class represented by plaintiff-appellants. Thereafter, the Department analyzed the data gathered in the surveys, and developed wage schedules. These schedules suggested increases for members of plaintiff-appellants' class in excess of 5.5%. The effective date of the proposed increases, pursuant to § 5344(a), was October 22, 1978.[6]
 
 
 12
 During this same period, as part of their efforts to control inflation,[7] both the President and Congress were acting to place a 5.5% cap on pay increases for, respectively, white-collar personnel and blue-collar workers paid from funds appropriated by Congress. In August 1978, the President, invoking the authority Congress granted him in 5 U.S.C. § 5305(c) (1976),[8] capped at 5.5% proposed pay increases for white-collar workers. 14 Weekly Comp. of Pres. Doc. 1480. In October 1978, in an appropriations measure, Congress imposed the 5.5% pay increase cap on appropriated fund blue-collar workers. Consistent with the President's August 1978 action, the measure also capped the pay increase for white-collar workers. Treasury, Postal Service and General Government Appropriations Act, § 614(a), Pub.L.No.95-429, 92 Stat. 1001 (1978).
 
 
 13
 By letter dated October 30, 1978, the Department of Defense requested Civil Service Commission advice concerning the impact of the President's anti-inflation program on wage schedules for nonappropriated fund prevailing rate workers, and it withheld issuance of the proposed schedules pending a reply to its request. On January 4, 1979, President Carter issued a memorandum to the heads of all executive departments and agencies in which he declared that in the public interest no category of federal employees should receive a pay increase exceeding 5.5% for fiscal year 1979. He directed inclusion of nonappropriated fund employees under the 5.5% cap[9] and ordered the Chairman of the Civil Service Commission and his successor, the Director of OPM, to assist agency heads in complying with his policy determination.
 
 
 14
 On February 28, 1979, OPM issued a personnel bulletin to lead agencies, including the Department of Defense, directing that wage increases for prevailing rate nonappropriated fund workers be capped at 5.5%. Beginning that same day, the Department of Defense issued wage schedules limiting to 5.5% the wage increases at issue here. Pursuant to 5 U.S.C. § 5344(b), the increases were made retroactive to October 22, 1978.
 
 
 15
 Appellants brought the two suits consolidated in this appeal seeking mandamus relief and declarations that failure to implement wage schedules proposing increases in excess of 5.5% violated both the prevailing rate statute and the due process rights of the class of workers they represent. On cross-motions for summary judgment, the district court ruled for the defendants in both actions.
 
 II.
 
 16
 We turn initially to two arguments that bear swift disposition. First, appellants assert that, prior to President Carter's January 4, 1979, pay cap memorandum, the members of the class they represent had acquired vested rights to pay increases in the amounts suggested by the August and September 1978 wage surveys; denial of those increases, they contend, violated the Fifth Amendment's due process guarantee. Second, appellants claim that defendants Brown and Cleland (the Secretary of Defense and Administrator of the Veterans Administration) acted arbitrarily and capriciously because they followed the lead of the President and OPM and made no independent determination that the 5.5% cap was permissible under law and consistent with the public interest.
 
 
 17
 Appellants' due process claim has been considered and decided by this court. Our opinion in American Federation of Government Employees v. Campbell, supra, slip op. at 10-14, deals with an almost identical vested rights argument and rejects it. We held in that case that prevailing rate employees acquire no right to a pay increase before the "operative date" the date on which the agency issues an order fixing the amount of the increase. No such order issued in this case before February 28, 1979. While the increase, when ordered, was retroactive to an "effective date" of October 22, 1978, no right to an increase had vested at the time of the President's January 4, 1979, memorandum. Since we adhere to the decision in American Federation of Government Employees v. Campbell, we need dwell no further on appellants' vested rights/due process contentions.
 
 
 18
 Largely for the reasons stated by the district court, 481 F.Supp. 711, 717-18, we find nothing arbitrary in the decision of the officials involved not to go their own separate ways in light of the President's directive and OPM's instruction.[10] Within the range of choice allowed by statute, the President may direct his subordinates' choices.[11] As appellants recognize, Congress sought to assure a coordinated federal wage system and to curtail disparity in wages between employees of different agencies performing similar tasks in the same locality. See 5 U.S.C. § 5341(1); 118 Cong.Rec. 21017 (1972) (remarks of Sen. McGee). Such disparity would be promoted, not curtailed, were each agency head to determine independently whether the 5.5% cap was permissible under law and consistent with the public interest.
 
 III.
 
 19
 The principal question raised on behalf of the nonappropriated fund workers is novel and substantial. Congress itself did not cap the wage increases of these workers, nor did it expressly authorize the President to do so. Both sides agree that the prevailing rate statute requires wage surveys; they disagree on the leeway the executive has under the statute's public interest clauses to set wage increases different from those indicated by the wage surveys.[12]
 
 
 20
 According to the Government, the wage surveys under § 5343 serve only to recommend the appropriate limits for wage increases, and the guiding principles stated in § 5341 do not detract from the independent force of the public interest clauses. Those clauses, as the Government reads them, permit the executive to determine what wage increases are wise under all existing circumstances: the executive may take into account considerations not mentioned in the prevailing rate statute, inflation in the matter before us; indeed, the executive may treat such considerations as overriding those enumerated in the statute.[13]
 
 
 21
 While the Government urges subordination of all other provisions of the prevailing rate statute to the public interest clauses, the unions attribute to those clauses slender significance. The statute requires maintaining federal wages in line with prevailing levels for comparable work in the private sector, the unions insist. The only leeway they acknowledge relates to defining wage areas, selecting the survey methodology and the mode of analyzing the survey data, and adopting measures to "even out" distinctions between government pay practices and those of private industry in the interest of making a valid determination of comparability.
 
 
 22
 We find neither of these polar views convincing. Under the Government's view, the appropriations bill provision was unnecessary to cap the wages of appropriated fund workers; the public interest provisions of the prevailing rate statute, the Government contends, could have been used by the agencies to accomplish the same result.[14] This position encounters two formidable obstacles: the legislative purpose motivating the 1972 overhaul of the pay system for prevailing rate employees; and the express authority Congress gave the President to cap the pay of white-collar workers in the public interest.
 
 
 23
 Before 1972, the prevailing rate statute set out no list of principles in § 5341, nor did it specify, as § 5343 now does, the manner in which agencies are to determine what rates prevail.[15] Senator McGee, the Senate floor manager of the bill (H.R.9092) that Congress enacted in 1972,[16] explained that the purpose was to anchor executive decisions to statutory guidelines and policy. Referring to the then existing statute and the objective of the amendments, Senator McGee said:
 
 
 24
 The President may at his discretion revise the system, and the 650,000 employees in the system do not have the assurance of guidelines established in law.... The (prevailing rate) employees are the only group in the executive branch who do not have either a formal job classification and pay system established by law or collective bargaining options. The time is long overdue for establishing such an orderly statutory system.
 
 
 25
 In its simplest form, that is what H.R.9092 does. It says that this is going to be the law when it comes to blue-collar workers. This is what the President and Civil Service Commission ... are going to do.... Guidelines are established in this bill that shall direct the course of administrative action .... The guidelines are not extensive. They will not bind the hands of the executive branch too firmly. But they will assure ... blue-collar workers that to borrow a phrase yes, Virginia, there is a Congress of the United States, and there is a policy for the blue-collar employment system.[17]
 
 
 26
 Remarks by both supporters and opponents of the 1972 amendments[18] are consistent with Senator McGee's repeated plain statements that the intent was to "set standards of direction" that would control administrative practices and constrain executive discretion.[19] Given this history, it is clear that Congress meant to set, not merely to recommend, policy and principles.
 
 
 27
 While Congress did not expressly authorize the President to respond to inflation by capping the pay of prevailing rate blue-collar workers, it did provide such authorization with respect to white-collar workers. Under the Federal Pay Comparability Act, 5 U.S.C. § 5301 et seq. (1976 & Supp. III 1979), the President, following a procedure prescribed by Congress, is required to adjust pay rates to levels comparable with private enterprise rates. 5 U.S.C. §§ 5305(a)(2), 5301(a)(3). Based on "economic conditions affecting the general welfare," however, the President may prescribe an alternative plan for pay adjustments. 5 U.S.C. § 5305(c)(1). The alternative plan, if presented within the time Congress set, supplants the comparability adjustments otherwise required unless either House passes a disapproving resolution within thirty days. 5 U.S.C. § 5305(c)(2), (m). See National Treasury Employees Union v. Nixon, 492 F.2d 587, 592-601 (D.C.Cir.1974).[20] It may be that a provision authorizing adjustment of prevailing rate workers' pay based on "economic conditions affecting the general welfare," would today attract legislative support. If that is the case, Congress is equipped to take the necessary action. It is not within the province of the administration or the courts to provide the statutory amendment.
 
 
 28
 The unions' view also flounders on more than one shoal. Precedent supports executive discretion under the public interest language to establish schedules that do not precisely parallel wage rates prevailing in the private sector. See Daigle v. United States, No. 264-76 (Ct.Cl. July 14, 1978) (§ 5348); Daniels v. United States, 407 F.2d 1345, 1347 (Ct.Cl.1969) (§ 5348); Rogers v. Laird, 319 F.Supp. 1, 4 (E.D.Va.1970) (§ 5341). Most significantly, in their zeal to maintain that 5 U.S.C. §§ 5341 and 5343 mandate, without exception, pay rates in line with those paid by private employers for comparable work, the unions disregard the very first principle Congress placed in § 5341: equal pay for equal work in all federal agencies within the same locality.
 
 
 29
 Until oral argument in this court, the Government also failed to take into account that first § 5341 principle, evenhanded treatment of federal employees performing "substantially equal work under similar conditions ... in the same local wage area." Given the pay cap effectively limiting the increase for appropriated fund workers to 5.5%, it would be inconsistent with § 5341(1) for nonappropriated fund workers to remain exempt from the limitation.[21] On the other hand, § 5341(3), the principle the unions stress to the exclusion of § 5341(1), calls for rates aligned with those paid locally for comparable work in the private sector. Whether one principle should give way to the other, or whether a mid-way accommodation should be made, must be resolved in the first instance by executive officials. The sole matter appropriately resolved at this juncture by the court is whether the executive branch has correctly applied the statute that establishes its authority. We hold that it has not. Under the structure of government the separation of powers established by the Constitution, the President has no authority to alter policy and principles declared by Congress even if, at the time the President acts, signals from Congress suggest it would approve the President's action. Cf. Youngstown Sheet and Tube Co. v. Sawyer, 343 U.S. 579, 594, 72 S.Ct. 863, 889, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring) ("The accretion of dangerous power ... come(s), however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority."). We must therefore reject the sole position advanced by the Government in support of the contested executive action that the President remains free to define the "public interest" in any reasonable manner and without reliance upon the explicit standards Congress set to constrain executive discretion.
 
 Conclusion
 
 30
 We hold that the public interest clauses do not have a life of their own, separate and distinct from the guides Congress enumerated in the prevailing rate statute. We therefore conclude that the defendants acted impermissibly in capping the wages of nonappropriated fund workers solely on the basis of the President's anti-inflation program. We further hold, however, that the wage surveys made pursuant to § 5343 are nonbinding to this extent: executive officials may exercise discretion, "consistent with the public interest," to alter the rates suggested by the survey, provided that they do so within the confines of the principles of wage policy Congress established in § 5341.
 
 
 31
 In the situation before us, the Department of Defense acted on an impermissible basis. We cannot anticipate the result of a permissible exercise of executive discretion, however, for the principles of wage policy set out in § 5341 point in conflicting directions here. One principle calls for equal pay for equal work among employees of different federal agencies. Because of the congressionally imposed pay cap on the wages of blue-collar workers paid from appropriated funds, this principle would be served by imposition of the 5.5% cap. Other policies call for maintenance of a pay rate "in line with prevailing levels for comparable work within a local wage area" and sufficient to attract and retain qualified workers. These policies might lead the Defense Department to establish wage schedules at a higher rate, closer to rates paid employees in the private sector.
 
 
 32
 At oral argument the Government's counsel urged that we affirm on the ground that § 5341(1) would justify the pay cap decision at issue here. But counsel candidly acknowledged that the Secretary grounded his decision on the broad discretion he believed was conferred by the "public interest" clauses, and not on the basis of § 5341(1). We therefore cannot assume that, if given the opportunity, the defendants necessarily would act in the manner counsel forecast. See SEC v. Chenery Corp., 318 U.S. 80, 88, 94, 63 S.Ct. 454, 459, 462, 87 L.Ed. 626 (1943); Ashland Oil, Inc. v. FTC, 548 F.2d 977, 981 (D.C.Cir.1976).[22]
 
 
 33
 We therefore reverse the judgments of the district court, declare that the pay cap determination was arrived at in a manner contrary to law, and remand for the issuance of directions that defendant-appellees take such further action, consistent with this opinion, as may be appropriate.[23]
 
 
 34
 Reversed and remanded.
 
 ROBB, Circuit Judge, dissenting:
 
 35
 The appellants, hereinafter referred to as plaintiffs, are two unions and two individuals representing a class of about 100,000 federal blue-collar workers employed in organizations such as Defense Department commissaries and post exchanges and Veterans Administration canteens. These workers are not paid with funds appropriated by Congress, but rather with funds received from other sources, mainly income generated by the organizations employing them. They are known as "prevailing rate employees", and like blue-collar workers paid with appropriated funds are covered by 5 U.S.C. § 5341, et seq., the prevailing rate statute.
 
 The prevailing rate statute provides:
 
 36
 It is the policy of Congress that rates of pay of prevailing rate employees be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates and be based on principles that
 
 
 37
 (3) The level of rates of pay will be maintained in line with prevailing levels for comparable work within a local wage area; ....
 
 
 38
 5 U.S.C. § 5341.
 
 
 39
 Section 5343 of the statute requires that "The pay of prevailing rate employees shall be fixed and adjusted from time to time as nearly as is consistent with the public interest in accordance with prevailing rates." A procedure for determining prevailing rates is set out in detail.
 
 
 40
 Applying the mechanism specified by 5 U.S.C. § 5343 the Department of Defense conducted a wage survey and established for the plaintiffs' class wage schedules based upon prevailing rates. The schedule so established provided for increases ranging from 6.5 per cent to 8.9 per cent in the pay rates for various groups in the plaintiffs' class. The effective date of the proposed increases was October 22, 1978.
 
 
 41
 In April 1978 President Carter announced that to combat inflation he would propose in fiscal year 1979 (October 1, 1978 to September 30, 1979) a 5.5 per cent limit on pay increases for federal executives or "white-collar employees." (14 Weekly Comp. of Pres. Doc. 714). The proposal was transmitted to Congress on October 31, 1978 (14 Weekly Comp. of Pres. Doc. 1480), and neither House having objected, went into effect in October 1978, pursuant to 5 U.S.C. § 5305(c).
 
 
 42
 Meanwhile, in June 1978, the Senate amended an appropriations bill so as to impose the 5.5 per cent limitation on increases for federal blue-collar workers paid from appropriated funds. This appropriations bill passed the Senate and the House on October 4, 1978 and was signed by the President October 10, 1978. It provided that no funds appropriated for the fiscal year October 1, 1978 September 30, 1979, "may be used to pay ... any individual in an amount which exceeds the rate ... payable ... on September 30, 1978, by more than 5.5 percent, as a result of any adjustments which take effect during such fiscal year under ... (3) section 5343 of title 5 ... if such adjustment is granted pursuant to a wage survey (but only with respect to prevailing rate employees described in section 5342(a)(2)(A) of (title 5))." (P.L. 95-429, 92 Stat. 1001) The last clause of subsection (3) excluded the plaintiffs who are not paid from appropriated funds and whose rates of pay are therefore not germane to an appropriations bill.
 
 
 43
 On January 4, 1979 the President issued a "MEMORANDUM FOR THE HEADS OF EXECUTIVE DEPARTMENTS AND AGENCIES" on the subject "Federal Pay and the Anti-inflation Program". The memorandum stated:
 
 
 44
 The success of our anti-inflation effort is critical to the economic well- being of the nation. To achieve this success, it is vital that the Government, in managing its own affairs, join with the rest of the nation in a positive commitment to reducing inflationary pressures. Accordingly, I have determined that it would be inconsistent with the public interest for any category of Federal pay rates to be increased by more than 5.5 percent during fiscal year 1979.
 
 
 45
 To this end, this Administration and the Congress have frozen Federal executive pay altogether, and have placed a 5.5 percent ceiling on pay increases for most Federal workers those under the General Schedule and related pay systems, the members of the uniformed services, and most Federal wage employees.
 
 
 46
 However, there are substantial numbers of nonappropriated fund employees and other workers employed by entities of the Federal Government who are not covered by these Government-wide actions, since they are under a variety of relatively small pay systems over which you have pay setting authority. In order to ensure that proposed pay increases for other pay systems do not exceed the maximums for Federal pay that the Congress and I have set, the policy of this Administration is:
 
 
 47
 In the public interest to control inflation, each officer or employee in the executive branch who has administrative authority to set rates of pay for any Federal officers or employees should exercise such authority, to the extent permissible under law, treaty, or international agreement, in such a way as to ensure that no rate of pay for any category of officers or employees is increased more than 5.5 percent during fiscal year 1979.
 
 
 48
 In accordance with the President's memorandum of January 4, 1979 increases in the plaintiffs' pay were limited to 5.5 per cent, a reduction from the 6.5 to 8.9 per cent increases proposed by the wage survey.
 
 
 49
 The plaintiffs argued in the District Court and contend on this appeal that once wage schedules reflecting local prevailing rates had been developed the Secretary of Defense had "a nondiscretionary duty to implement the wage schedule figures." (Br., p. 18) The defendants say the prevailing rate statute, 5 U.S.C. § 5343, "is mandatory in nature" and does not "authorize, permit or in any fashion grant defendant the discretion to refuse to fully implement wage rates established pursuant to an appropriate wage survey. The law permits no discretion, no latitude." (Br., p. 24) The District Court rejected this argument, saying:
 
 
 50
 The plain language of both statutes cited by plaintiff states that adjustments to increase wage schedules of prevailing rate government workers are to be made "as nearly as is consistent with the public interest." 5 U.S.C. §§ 5341, 5343(a) (1976). The inclusion of these words in the statutes indicates that Congress did not intend that prevailing rate government workers automatically receive whatever the labor market in the private sector will bear, but rather that executive branch officials exercise discretion and make policy judgments to determine precisely what rates of wage increase would be wise in light of all relevant factors.
 
 
 51
 National Federation of Federal Employees, Local 1622 v. Brown, 481 F.Supp. 704, 707, 708 (D.D.C.1979).
 
 
 52
 I think the District Court was right. In my judgment the prevailing rate statute means what it says: the executive has discretion, in the public interest, to deviate from wage schedule figures. So long as he does not abuse his discretion I think he does not exceed his authority. In this case I cannot say the President abused his discretion; on the contrary I believe all would agree that his effort to halt the inflationary spiral of wages was a sound reason for exercising discretion to reduce wage schedule rates. He reasonably and properly concluded that the wage schedule rates were inflationary and therefore not "consistent with the public interest."
 
 
 53
 The majority holds that "the wage surveys made pursuant to § 5343 are nonbinding to this extent: executives may exercise discretion, 'consistent with the public interest,' to alter the rates suggested by the survey, provided that they do so within the confines of the principles of wage policy Congress established in § 5341." Given this holding I suppose the majority would conclude that the President properly exercised executive discretion if in his memorandum of January 4, 1979 he had recited the principles of 5 U.S.C. § 5341 and then stated that after considering these principles he had determined that a 5.5 per cent raise was all the public interest would permit. I would hold however that the President's memorandum justified his discretionary action. It explained that in the circumstances this action was necessary "(i)n order to ensure that proposed pay increases for other pay systems do not exceed the maximums for Federal pay that the Congress and I have set," and "(i)n the public interest to control inflation". In the circumstances of this case I think this was enough, that the President's order was within the scope of the "public interest" provisions of sections 5341 and 5343 and that ritualistic citation of those sections was unnecessary.
 
 
 54
 I do not agree that SEC v. Chenery, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) is apposite, as suggested by the majority. In the Chenery case the SEC explicitly based its order on "broad equitable principles". Id., p. 87, 63 S.Ct. at 459. The Supreme Court held that broad equitable principles did not sustain the Commission's action, and that although the order might have been supported on statutory grounds it must be judged on the basis of the grounds relied upon by the Commission. In our case the President's action was explicitly based on "the public interest". This language, which I deem sufficient to invoke the authority of 5 U.S.C. § 5341 and 5343, provides an adequate basis upon which to sustain the Executive Order. Accordingly, the record before this court, unlike that in SEC v. Chenery, shows that the challenged action was based on statutory grounds. Furthermore, no party in this case suggested that the President's order was not based on the public interest provisions of 5 U.S.C. §§ 5341 and 5343; the question argued was whether the order was within the scope of those provisions.
 
 
 55
 I would affirm the judgment of the District Court.
 
 
 
 [1]
 Prevailing rate employees are federal employees who, like blue-collar workers in the private sector, are paid an hourly rate for their work. As defined by statute, these workers are engaged in trades or crafts or unskilled, semi-skilled, or skilled manual labor. See 5 U.S.C. § 5342(a)(2) (1976)
 
 
 [2]
 Members of the class represented by plaintiff-appellants are employed by such "nonappropriated fund instrumentalities" as Defense Department commissaries and Veterans Administration canteens
 
 
 [3]
 Treasury, Postal Service and General Appropriations Act, § 614(a), Pub.L.No.95-429, 92 Stat. 1001 (1978)
 
 
 [4]
 National Fed'n of Federal Employees v. Brown, 481 F.Supp. 704 (D.D.C.1979); American Fed'n of Gov't Employees v. Brown, 481 F.Supp. 711 (D.D.C.1979)
 
 
 [5]
 5 U.S.C. §§ 5341-5349 (1976 & Supp. III 1979). The "public interest" clauses in point appear in 5 U.S.C. §§ 5341 and 5343(a) ("pay of prevailing rate employees shall be fixed and adjusted as nearly as is consistent with the public interest in accordance with prevailing rates")
 
 
 [6]
 In American Fed'n of Gov't Employees v. Campbell, supra, slip op. at 4, 12-14, we explained that the "effective date" of a wage increase may precede the "operative date" of the increase. Employees acquire no right to a pay increase until the operative date the date on which the agency issues an order fixing the amount of the increase. However, once the amount is fixed on the operative date, the increase is to be paid retroactively if the effective date is earlier than the operative date
 
 
 [7]
 See 14 Weekly Comp. of Pres. Doc. 1480 (Aug. 31, 1978); 124 Cong.Rec. S9865-66 (daily ed. June 27, 1978) (remarks of Sen. Eagleton)
 
 
 [8]
 Section 5305(c) permits the President, subject to a disapproving resolution by either House, to alter recommended pay adjustments "because of national emergency or economic conditions affecting the general welfare." See p. 1024 infra
 
 
 [9]
 In his memorandum, the President stated:
 (T)here are substantial numbers of nonappropriated fund employees and other workers employed by entities of the Federal Government who are not covered by these Government-wide actions (limiting pay increases to 5.5 percent), since they are under a variety of relatively small pay systems over which (department and agency heads) have pay setting authority. In order to ensure that proposed pay increases for other pay systems do not exceed the maximums for Federal pay that the Congress and I have set, the Policy of this Administration is:
 In the public interest to control inflation, each officer or employee in the executive branch who has administrative authority to set rates of pay for any Federal officers or employees should exercise authority, to the extent permissible under law, treaty or international agreement, in such a way as to ensure that no rate of pay for any category of officers or employees is increased more than 5.5 percent during fiscal year 1979.
 Memorandum for the Heads of Executive Departments and Agencies, Subject: Federal Pay and the Anti-Inflation Program, 15 Weekly Comp. of Pres. Doc. 8 (Jan. 4, 1979).
 
 
 [10]
 In the district court, one of the unions (National Federation of Federal Employees) consistently represented that it did not assail the Government's action in setting the 5.5% pay cap as "arbitrary and capricious." 481 F.Supp. at 709 & n.7
 
 
 [11]
 See Myers v. United States, 272 U.S. 52, 135, 47 S.Ct. 21, 31, 71 L.Ed. 160 (1926) (President "may properly supervise and guide (executive officials') construction of the statutes under which they act in order to secure (the) unitary and uniform execution of the laws"). Case law on the President's authority to direct agency action is sparse. For general discussion, see Bruff, Presidential Power and Administrative Rulemaking, 88 Yale L.J. 451 (1979)
 
 
 [12]
 The Government stresses that the public interest qualification in federal pay statutes is "well-established." H.Rep.No.92-339, 92d Cong. 1st Sess. 11 (1971). It derives from the Civil War era (Act of July 16, 1862, ch. 184, 12 Stat. 587) and had been used for over a century at the time of the 1972 amendments to the prevailing rate pay legislation. The unions, on the other hand, note that the Government is able to cite not a single instance prior to this controversy in which the public interest qualification has been invoked to justify supplanting entirely the principle that federal pay rates be established in accordance with prevailing rates for comparable work in the private sector. Both sides agree that the public interest qualification does not "authorize a complete frustration of the Congressional scheme." Blaha v. United States, 511 F.2d 1165, 1170 (Ct.Cl.1975)
 
 
 [13]
 This position was apparently accepted by the district court. 481 F.Supp. at 708 (executive officials are to "exercise discretion and make policy judgments ... in light of all relevant factors" on "what rates of wage increase would be wise" and the extent to which "the wage rates prevailing in the private sector can appropriately be applied to government workers")
 
 
 [14]
 The Government argues that the legislative action is relevant to this extent: it reveals how Congress viewed the public interest, it signalled to the President the legislature's understanding that capping all federal wages at 5.5% would be entirely "consistent with the public interest" within the meaning of §§ 5341 and 5343. The unions argue expressio unius est exclusio alterius: Congress specifically covered prevailing rate workers paid by appropriated funds; it therefore intended that employees paid with nonappropriated funds not be subject to the pay cap
 For the reasons indicated in the text, infra, we reject the Government's argument that the action by Congress was essentially advisory unnecessary to accomplish the wage increase cap. As to the unions' position, we are unable to attribute to Congress any deliberate decision to spare nonappropriated fund workers from a pay cap. The most likely explanation for the omission, Congress was dealing with appropriations; a limitation on the expenditure of appropriated funds would not affect the class of workers represented here. Hence, coverage of such workers would not have been germane to the spending measure on which Congress acted. See Watkins & Riddick, Senate Procedure: Precedents and Practices 111 (1964).
 
 
 [15]
 See Pub.L.No.89-554, 80 Stat. 471 (1966), as amended by Pub.L.No.90-83, § 1(97), 81 Stat. 220 (1967)
 
 
 [16]
 Pub.L.No.92-392, § 1, 86 Stat. 564 (1972)
 
 
 [17]
 118 Cong.Rec. 21017 (cols. 2-3) (1972) (emphasis added)
 
 
 [18]
 E. g., id. at 21029-30 (remarks of Sen. Pell) (specifically stating that the bill would prevent "the arbitrary freezing of blue-collar wages to combat inflation while workers in nongovernment jobs were permitted wage increases"); 117 Cong.Rec. 27680 (col. 1) (1972) (remarks of Rep. White) (supporter of amendments); id. at 27686 (col. 1) remarks of Rep. Ford) (same); id. at 27670 (col. 3) (remarks of Rep. Martin) (opponent of amendments); id. at 27673 (col. 1) (remarks of Rep. Gross) (same)
 
 
 [19]
 118 Cong.Rec. 21018 (col. 2) (1972). See id. at 21028 (cols. 1-2)
 
 
 [20]
 Unlike the prevailing rate workers' pay-setting system before us, initially scheduled pay raises under the Federal Pay Comparability Act become effective automatically absent prescription by the President of an alternative plan. National Treasury Employees Union v. Nixon, 492 F.2d 587, 601 (D.C.Cir.1974); National Fed'n of Federal Employees, supra, 481 F.Supp. at 710
 
 
 [21]
 President Carter's January 4, 1979, memorandum, supra note 9, did state a purpose "to ensure that proposed pay increases for other pay systems do not exceed the maximum for Federal pay that the Congress and I have set." However, his public interest determination was placed squarely on the need "to control inflation," and did not rely on the "standards of direction" for fixing and adjusting pay established by Congress in the prevailing rate statute. See text at note 19 supra
 
 
 [22]
 We recognize the appeal of the position taken by our colleague in dissent, that it is "ritualistic" to insist that the executive advert to congressional guidelines meant to give content to the term "public interest." See dissenting opinion at 1028. However, we find the "public interest," as the Government would have us define it (whatever is "wise in light of all relevant factors") hardly less broad or more constraining than the "equitable principles" invoked in Chenery
 
 
 [23]
 In the interim, to preserve the pay increases already accorded appellants, the pay orders issued by the Secretary following the President's January 4, 1979, memorandum shall remain in effect, retroactive to October 22, 1978