## POSADAS, COLLECTOR OF INTERNAL REVENUE, *v.* NATIONAL CITY BANK.

No. 114. Argued December 11, 12, 1935.—Decided January 6, 1936.

*Mr. William Cattron Rigby* for petitioner.

*Mr. Carl A. Mead,* with whom *Mr. Harry W. Forbes* was on the brief, for respondent.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The National City Bank of New York is organized under the National-Banking Act, as amended from time to time since its enactment. In 1930 the bank, after complying with the requirements of § 25 of the Federal Reserve Act of December 23, 1913, c. 6, 38 Stat. 251, 273, as amended September 7, 1916, c. 461, 39 Stat. 752, 755,

*infra,* established branches at Manila and Cebu in the Philippine Islands. A tax was levied by and paid to the Philippine Government on the net income of these branches for the first six months of the year 1931 (R. S. § 5219),[1] about which there is no controversy. The Philippine Government, however, in addition, levied capital and deposit taxes not permitted by § 5219, and, these having been paid by the bank under protest, this action was brought in the Court of First Instance of Manila to recover the amount. That court gave judgment in favor of the bank for only a part of the additional taxes; but the Philippine Supreme Court, upon appeal, reversed the judgment in so far as it was against the bank, and ordered a refund of the entire amount.

Section 25 of the Federal Reserve Act of 1913, *supra,* reproduced in the margin so far as it is pertinent here,[2]

---

[1] Sec. 5219, Revised Statutes (12 U. S. C. [1934 ed.] § 548), provides that the legislature of each state may "(1) tax said shares, or (2) include dividends derived therefrom in the taxable income of an owner or holder thereof, or (3) tax such associations on their net income, or (4) according to or measured by their net income, . . ." provided certain specified conditions are complied with.

[2] "Sec. 25. Any national banking association possessing a capital and surplus of $1,000,000 or more may file application with the Federal Reserve Board, upon such conditions and under such regulations as may be prescribed by the said board, for the purpose of securing authority to establish branches in foreign countries or dependencies of the United States for the furtherance of the foreign commerce of the United States, and to act, if required to do so, as fiscal agents of the United States. Such application shall specify, in addition to the name and capital of the banking association filing it, the place or places where the banking operations proposed are to be carried on, and the amount of capital set aside for the conduct of its foreign business. The Federal Reserve Board shall have power to approve or to reject such application if, in its judgment, the amount of capital proposed to be set aside for the conduct of foreign business is inadequate, or if for other reasons the granting of such application is deemed inexpedient."

authorizes the establishment of branches of national-banking associations "in foreign countries or dependencies of the United States." It cannot be doubted that, viewing this section without regard to later legislation, the branches here in question were lawfully established; for, as will appear at a later point in this opinion, the Philippine Islands are included by the words "dependencies of the United States." In that view of the matter, the additional taxes imposed by the Philippine Government are invalid under *Domenech* v. *National City Bank,* 294 U. S. 199, 204; *Talbott* v. *Silver Bow County,* 139 U. S. 438; and, were it not for the asserted effect of legislation subsequent to the passage of the Federal Reserve Act in 1913, which we shall examine in a moment, this case would be disposed of, without further detail, upon the authority of those cases. In the *Domenech* case we held that the national-banking laws extended to Puerto Rico; that a tax on a branch of a national bank is a tax on the bank; and that Puerto Rico, being a dependency of the United States, could not, except as permitted by R. S. § 5219, tax a national bank, since it is an agency of the United States. The *Talbott* case involved the power of a territory to impose a tax upon a national bank. This court held, in the first place, that the same power of taxation in respect of national banks exists in the territories as in the states; and, in the second place, that this power of taxation in the territories was limited by the provisions of § 5219 although in terms that section refers only to the states. 294 U. S. 204. We find nothing in the original Organic Act or in any of the early statutes relating to the Philippines referred to by petitioner .which takes those islands out of the controlling rule of the *Domenech* case that " a dependency may not tax its sovereign "; and we come to the only remaining point which we deem it necessary to discuss.

Petitioner contends that subsequent legislation has the effect of repealing and abrogating § 25 of the 1913 act, permitting the establishment of national bank branches, in so far as the Philippine Islands are concerned. This later legislation consists of certain provisions in the Organic Act for the Philippine Islands of August 29, 1916, c. 416, 39 Stat. 545, and the act of September 7, 1916, *supra,* amending designated sections of the original Federal Reserve Act.

We examine these statutory provisions in their chronological order. By § 25 of the 1913 act, as we have seen, national banks were authorized to establish branches in the Philippine Islands. The Organic Act of 1916 provides:

" Sec. 5. That the statutory laws of the United States hereafter enacted shall not apply to the Philippine Islands, except when they specifically so provide, or it is so provided in this Act.

" Sec. 6. That the laws now in force in the Philippines shall continue in force and effect, except as altered, amended, or modified herein, until altered, amended, or repealed by the legislative authority herein provided or by Act of Congress of the United States."

(Section 6 obviously is to be taken distributively—that is to say, as conferring power on the local legislature to deal only with local laws. It, of course, confers no power on the local legislature to alter, amend or repeal an act of Congress.)

" Sec. 31. That all laws or parts of laws applicable to the Philippines not in conflict with any of the provisions of this Act are hereby continued in force and effect."

By §§ 6 and 31 it is clear that § 25 of the Federal Reserve Act of 1913, not being in conflict with any provision of the Organic Act of 1916, was continued in full force and effect.

September 7, 1916, nine days after the passage of the new Organic Act, the act to amend the Federal Reserve Act, *supra,* was passed. It, first, is to be observed in respect of this amending act that it does not purport to enact a substitute for the Federal Reserve Act, or to repeal and re-enact any portion, but only to *amend* certain specified sections thereof. The old act contains thirty sections. The act of September 7, 1916, amends §§ 11, 13, subsection (e) of § 14, the second paragraph of § 16, §§ 24 and 25, and § 5202 of the Revised Statutes. The introductory words as to § 25 are—" That section twenty-five be, and is hereby, amended to read as follows." The original section is then copied, the only change or addition, so far as the question here is concerned, being the insertion of the words "or insular possessions" after the word "dependencies." No reason appears from anything called to our attention, and we are not ourselves aware of any reason, for the addition of these words, since the comprehensive term "dependencies" would seem to include all insular possessions which we then had. But in any event, the Philippine Islands constituted a dependency, for they were not possessions merely, but possessions held by right of cession from Spain and over which the United States undoubtedly had supreme power of legislation and government. See *United States* v. *The Nancy,* 3 Wash. C. C. 281, 286 *et seq.* Compare 34 Op. Atty. Gen. 287, 291. The only substantial change made in the old § 25 is the addition of a provision authorizing a national-banking association to invest in the stock of other banks and corporations chartered or incorporated under the laws of the United States or of any state engaged in international or foreign banking, or banking in dependencies or insular possessions of the United States; and it is fairly plain that this addition constituted the sole reason for amending the section.

The amending act just described contains no words of repeal; and if it effected a repeal of § 25 of the 1913 act, it did so by implication only.  The cardinal rule is that repeals by implication are not favored.  Where there are two acts upon the same subject, effect should be given to both if possible.  There are two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act.  But, in either case, the intention of the legislature to repeal must be clear and manifest; otherwise, at least as a general thing, the later act is to be construed as a continuation of, and not a substitute for, the first act and will continue to speak, so far as the two acts are the same, from the time of the first enactment.

The law on the subject as we have just stated it finds abundant support in the decisions of this court, as well as in those of lower federal and state courts.  It will be enough to direct attention to a few of these decisions out of a very large number.  In *United States* v. *Tynen*, 11 Wall. 88, 92, Mr. Justice Field, speaking for the court, after stating the general rule, said that if two acts " are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the first; and even where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act."  It was not meant by this statement to say, as a casual reading of it might suggest, that the mere fact that the latter act covers the whole subject and embraces new

provisions demonstrates an intention completely to substitute the latter act for the first. This is made apparent by the decision in *Henderson's Tobacco*, at the same term, 11 Wall. 652, 657, where, in an opinion delivered by Mr. Justice Strong, it is said, " But it must be observed that the doctrine [of the *Tynen* case] asserts no more than that the former statute is impliedly repealed, *so far* as the provisions of the subsequent statute are repugnant to it, or *so far* as the latter statute, making new provisions, is plainly intended as a substitute for it. Where the powers or directions under several acts are such as may well subsist together, an implication of repeal cannot be allowed." (Italics are in the original.) These two cases, with others, are briefly reviewed by this Court in *Red Rock* v. *Henry,* 106 U. S. 596, 601, by Mr. Justice Woods, and the court's conclusion stated as follows:

"The result of the authorities cited is that when an affirmative statute contains no expression of a purpose to repeal a prior law, it does not repeal it unless the two acts are in irreconcilable conflict, or unless the later statute covers the whole ground occupied by the earlier and is clearly intended as a substitute for it, and the intention of the legislature to repeal must be clear and manifest."

The implication of which the cases speak must be a necessary implication. *Wood* v. *United States,* 16 Pet. 342, 362–363. It is not sufficient, as was said by Mr. Justice Story in that case, "to establish that subsequent laws cover some or even all of the cases provided for by [the prior act]; for they may be merely affirmative, or cumulative, or auxiliary." The question whether a statute is repealed by a later one containing no repealing clause, on the ground of repugnancy or substitution, is a question of legislative intent to be ascertained by the application of the accepted rules for ascertaining that intention. *United States* v. *Claflin,* 97 U. S. 546, 551; *Eastern Extension Tel. Co.* v. *United States,* 231 U. S. 326, 332.

And, even in the face of a repealing clause, circumstances may justify the conclusion that a later act repeating provisions of an earlier one is a continuation, rather than an abrogation and reënactment, of the earlier act. *Bear Lake Irrigation Co.* v. *Garland,* 164 U. S. 1, 11–13.

Petitioner relies on *Murdock* v. *Memphis,* 20 Wall. 590, 617; but it is sufficient to say that the rule which we have quoted from *Red Rock* v. *Henry, supra,* was formulated with that case in mind, since it is specifically mentioned.

In some of the states, the principle has been embodied in statutes to the general effect that provisions of a prior statute, so far as they are reproduced in a later one, are to be construed as a continuation of such provisions and not as a new enactment. See *Barrows* v. *People's Gaslight & Coke Co.,* 75 Fed. 794, 795. But such statutes are only declaratory of the rule of the common law. *Dallmann* v. *Dallmann,* 159 Wis. 480, 485–486; 149 N. W. 137; *Julien* v. *Model B., L. & I. Assn.,* 116 Wis. 79, 89–90; 92 N. W. 561. See, also, *Ely and others* v. *Holton,* 15 N. Y. 595, 598, 599; *Moore* v. *Mausert,* 49 N. Y. 332, 335; *Longlois* v. *Longlois,* 48 Ind. 60, 63–64; *People* v. *N. Y., C. & St. L. R. Co.,* 316 Ill. 452, 457–458; 147 N. E. 494.

Applying the rule established by the foregoing and other authorities, we see nothing in the terms of the Federal Reserve amending act, in the provisions of the new Organic Act, or in the history of Philippine legislation, which justifies the conclusion that by the amendment of 1916 Congress intended to repeal the old § 25 of the Federal Reserve Act. The amendment is made in a well-approved form—a form which, indeed, many of the states compel by constitutional provision—namely, by repeating the language of the original section with the additions to which we have heretofore called attention. Unless the contrary plainly appear, the employment of such form of amendment is simply to serve the causes of con-

venience and certainty. That is to say, by carrying the full text forward, the task of searching out and bringing together the various fragments which go to make up the completed whole, after specific eliminations or additions by amendment, is rendered unnecessary; and possible doubt as to the precise terms of the law as amended is avoided. Or, as Chief Judge Denio said in *Ely and others* v. *Holton, supra*—

" In short, we attribute no effect to the plan of dove-tailing the amendment into. the original section, except the one above suggested, of preserving a harmonious text, so that when future editions shall be published the scattered members shall easily adjust themselves to each other."

It follows that such parts of the original § 25 as were copied into the amended section were not thereby repealed and immediately reënacted, but continued, uninterruptedly, to be the law after the amendment precisely as they were before. Section 5 of the Organic Act of 1916, *supra,* which in terms relates only to laws *thereafter* enacted, must be put aside as not applicable.

*Judgment affirmed.*