**PASSAMAQUODDY TRIBE, Plaintiff,**

v.

**STATE OF MAINE, and Angus S. King, Jr., Defendants.**

Civ. No. 95–0025–B.

United States District Court,
D. Maine.

Aug. 8, 1995.

Thomas N. Tureen, Portland, ME, for Plaintiff.

Thomas D. Warren, Office of the Attorney General, Augusta, ME, for Defendant.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff, the Passamaquoddy Indian Tribe, seeks to force the State of Maine to negotiate a Tribal–State compact under the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721 ("Gaming Act"). Defendants, the State of Maine and Governor Angus S. King, Jr. ("Defendants," or "the State"), contend that the Gaming Act does not apply in this case because of an exemption written into the Maine Indian Claims Settlement Act of 1980, 25 U.S.C. §§ 1721–1735 ("Settlement Act" or "Maine Settlement Act").

## I. BACKGROUND

The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, was enacted in 1988 and promulgates a uniform federal policy for the regulation of gaming activity on Indian lands. The Gaming Act provides, in part, that:

> Indian Tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a state which does not, as a matter of criminal law and public policy, prohibit such gaming activity.

25 U.S.C. § 2701(5). The Gaming Act requires that states negotiate in good faith with tribes wishing to establish casino gaming on their lands. 25 U.S.C. § 2710(d)(3)(A). Plaintiff contends that Maine violated the

Gaming Act by refusing to negotiate with the Tribe. The State replies, however, that the Gaming Act does not apply within Maine because of language in the previously enacted Settlement Act.

Enacted in 1980, the Settlement Act was a Congressional ratification of a settlement between the State of Maine, the federal government, and the Indian tribes in Maine. *See* 25 U.S.C. §§ 1721(a)(7), 1721(b). Pursuant to that settlement, Maine's Indian tribes agreed to relinquish their claims for possession of land in Maine, and submit to the jurisdiction of Maine laws. 25 U.S.C. §§ 1723(b)(c), 1721(b)(4), 1725(a). In exchange, the tribes were provided with an eighty-one-and-a-half million dollar settlement, and were granted legal status as federally-recognized Indian tribes. 25 U.S.C. § 1733. The Settlement Act provision in dispute in this case, § 1735(b), reads as follows:

> The provisions of any Federal law enacted after October 10, 1980, for the benefit of Indians, Indian nations, or tribes or bands of Indians, which would affect or preempt the application of the laws of the State of Maine, . . . shall not apply within the State of Maine, unless such provision of such subsequently enacted Federal law is specifically made applicable within the State of Maine.

25 U.S.C. § 1735(b).

In April 1994, the Tribe's proposal to build a casino near Calais, Maine was rejected by the Maine legislature. The Tribe then attempted to initiate negotiations with the State pursuant to the Gaming Act. In August 1994, the Attorney General issued an opinion concluding that the Gaming Act did not apply to the State of Maine, because it was not specifically made applicable within Maine as required by § 1735(b) of the Settlement Act. Plaintiff filed this action in January 1995. The State moves for judgment on the pleadings. The matter has been fully briefed and argued before the Court.

## II. DISCUSSION

■ This dispute is particularly salient because the Passamaquoddy Tribe's ability to reap the benefits of casino gaming "likely hangs in the balance." *Rhode Island v. Nar-*

*ragansett Indian Tribe,* 19 F.3d 685, 688 (1st Cir.) (2–1 decision), *cert. denied,* —— U.S. ——, 115 S.Ct. 298, 130 L.Ed.2d 211 (1994). Nonetheless, this controversy is principally a debate over statutory interpretation. A basic tenet of statutory construction is that: "Where there are two acts upon the same subject, effect should be given to both if possible." *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936). "In other words, so long as the two statutes, fairly construed, are capable of coexistence, courts should regard each as effective." *Narragansett,* 19 F.3d at 703 (citation omitted).

■ In this case, the Settlement Act provides that subsequent federal Indian legislation shall not apply in Maine unless the new legislation is "specifically made applicable within the State of Maine." 25 U.S.C. § 1735(b). The Gaming Act, however, is silent as to its application within the State of Maine. Defendants interpret this silence, in conjunction with the Settlement Act's limiting clause, to mean that the Gaming Act does not apply within Maine. The Tribe responds that, even in the absence of an express clause making the Gaming Act applicable within Maine, the Act impliedly repeals the Settlement Act and therefore applies. However, it is a "bedrock principle that implied repeals of federal statutes are disfavored." *Narragansett,* 19 F.3d at 703; *see also Posadas,* 296 U.S. at 503, 56 S.Ct. at 352 ("The cardinal rule is that repeals by implication are not favored.").

Moreover, while *Narragansett* involved an implied repeal by the Gaming Act of the Rhode Island Settlement Act, that decision is readily distinguishable from this case. First, and most importantly, the Rhode Island Settlement Act, unlike the Maine Act, contains no express limiting language with respect to future legislation. Given the Maine Settlement Act's unambiguous language requiring future federal Indian legislation to be specifically applicable within Maine, the Gaming Act's silence should not be construed to effectuate an implied repeal. "In the game of statutory interpretation, statutory language is the ultimate trump card." *Narragansett,*

19 F.3d at 699. In this case, the unequivocal language in the Maine Settlement Act clearly trumps the Gaming Act's general provisions that are silent as to Maine.

As noted by the dissent in *Narragansett*, the legislative history of the Gaming Act supports this conclusion. The Senate Report which accompanied the bill states:

> [I]t is the intention of the Committee that nothing in the provision of this section or in this act will supersede any specific restriction or specific grant of Federal authority or jurisdiction to a State which may be encompassed in another Federal statute, including the Rhode Island Claims Settlement Act ... and the [Maine] Indian Claim Settlement Act.

S.Rep. No. 446, 100th Cong., 2nd Sess. 12 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3082. The Senate Report indicates that the drafters of the Gaming Act were at least aware of the Maine Settlement Act.[1] "[S]uch statements are to be respected only to the extent that they are consistent with the statutory language." *Narragansett*, 19 F.3d at 699 (quotations and citations omitted) (dismissing the significance of floor statements regarding the interface between the Rhode Island Act and the Gaming Act). In this case, however, the Gaming Act's silence as to its applicability within Maine is consistent with both the Senate Report and the Maine Settlement Act's express limiting clause. It is the Court's conclusion, therefore, that Congress intended to leave the Maine Settlement Act intact.[2]

In addition, the Maine Settlement Act "set up a relationship between the tribes, the state, and the federal government different from the relationship of Indians in other states to the state and federal governments." *Penobscot Nation v. Stilphen*, 461 A.2d 478, 489 (Me.1983). The Court finds it highly probable that one offshoot of that unique relationship is Section 1735(b), which renders future federal Indian laws inapplicable absent a provision making them specifically applicable within Maine.

At oral argument, the Tribe attempted to bolster its argument for implied repeal by citing *Marcello v. Bonds*, 349 U.S. 302, 75 S.Ct. 757, 99 L.Ed. 1107 (1955). In *Marcello*, the Supreme Court held that a provision of the Immigration and Nationality Act of 1952 (INA) superseded the Administrative Procedure Act of 1946 (APA) as it applied to deportation proceedings. *Marcello*, 349 U.S. at 310, 75 S.Ct. at 761. The APA provided that " '[n]o subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly.' " *Marcello*, 349 U.S. at 316, 75 S.Ct. at 765 (Black, J., dissenting) (citing § 12 of the APA). While the INA did not expressly supersede or modify the APA, the later Act did provide that "[t]he procedure [herein prescribed] shall be the *sole and exclusive* procedure for determining the deportability of an alien under this section." *Id.* at 309, 75 S.Ct. at 761 (emphasis added).

The Court interpreted this language, and the INA's legislative history—which indicated that the INA was intended to apply notwithstanding the APA—and concluded that the INA superseded the APA.[3] *Id.* at 309–10, 75 S.Ct. at 761–62. At oral argument, the Tribe relied heavily on the Court's statement that: "Unless we are to require the Congress to employ magical passwords in order to effectuate an exemption from the Administrative Procedure Act, we must hold that the present statute expressly supersedes the hearing provisions of that Act." *Id.* at 310,

---

1. *See also Narragansett*, 19 F.3d at 704 n. 21 (Congress was "demonstrably aware" of the Rhode Island Settlement Act at the time of the Gaming Act's enactment.).

2. At the very least, no cohesive reading of the Senate Report, the Settlement Act's limiting clause, and the Gaming Act's silence as to Maine, could lead to the conclusion advocated by the Plaintiff—that the Gaming Act impliedly repeals the Settlement Act.

3. The Court noted that earlier, draft versions of the INA "included statements to the effect that the [deportation] procedures were to be exclusive '[n]otwithstanding any other law, including the [APA].' " *Marcello*, 349 U.S. at 309, 75 S.Ct. at 761 (citations omitted). The Court concluded that despite the deletion of this stronger provision, the "sole and exclusive procedure" language in the bill's final version was sufficient to expressly supersede the APA. *Id.* at 309–10, 75 S.Ct. at 761–62.

75 S.Ct. at 761. The Tribe neglects to cite, however, the aforementioned legislative history or the Court's directive that "[e]xemptions from the terms of the Administrative Procedure Act are not lightly to be presumed in view of the statement in § 12 of the Act that modifications must be express[.]" *Id.* at 310, 75 S.Ct. at 761, (citing *Shaughnessy v. Pedreiro*, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868 (1955)).[4] This Court concludes that implied repeal should not be presumed in this case, particularly in light of the "specifically made applicable" requirement in the Maine Settlement Act and the lack of any language in the Gaming Act similar to that found by the *Marcello* Court in the INA.

■ In addition to arguing implied repeal, the Tribe contends that the Settlement Act unconstitutionally abridges the law-making powers of subsequent Congresses and is therefore not applicable in this case. (Pl.'s Mem. at 10–11.) In support of its position, Plaintiff cites, among other authorities, a hornbook from 1904 and a Supreme Court case from 1810[5] for the postulate that "[t]he legislature cannot bind a future legislature to a particular mode of repeal. It cannot declare in advance ... the effect of subsequent legislation upon existing statutes." *Id.* at 10 (quoting 1 J. Sutherland, *Statutes and Statutory Construction* 457 (J. Lewis ed. 1904)). The Tribe's argument, however, flies in the face of the *Marcello* and *Shaughnessy* opinions, which clearly indicate that Congress can enact language specifying that future legislation must expressly supersede prior law. The Court concludes that the Settlement Act does not represent an unconstitutional abridgment of future Congressional power.

■ The Court notes that absent the limiting language in the Settlement Act, the Gaming Act would clearly apply to, and control,

the result in this case. As required by the provisions of Gaming Act, the Passamaquoddy Tribe is federally recognized, it exercises jurisdiction over its tribal lands, and it possesses powers of self-government. However, none of these facts alter the clear statement in the Settlement Act that general federal Indian legislation does not apply within Maine unless specifically made so applicable.

The Court notes with interest a recent decision by the Fifth Circuit Court of Appeals, *Ysleta del Sur Pueblo v. Texas*, 36 F.3d 1325 (5th Cir.1994), in which that court examined the effect of the Gaming Act on another, pre-existing federal statute. *Ysleta* involved a prior act known as the Restoration Act, which granted federal trust status to the Indians of the Ysleta del Sur Pueblo. That court held that a clause in the Restoration Act that specifically prohibited gambling was not superseded by the Gaming Act, despite the conflict between the two statutes. *Id.* at 1335. Several of the factors upon which the court relied to reach its decision are instructive here.

The *Ysleta* court stated that "where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment". *Id.* (citations, quotations, and emphasis omitted). In this case, the Maine Settlement Act is the more specific statute with respect to its impact on Maine. While it "applies to ... specifically named Indian tribes located in one particular state, [the Gaming Act] applies to all tribes nationwide."[6] *Id.* In addition, "Congress, when enacting [the Gaming Act] ... explicitly stated in two separate provisions ... that [the Act] should be considered in light of other federal law." *Id.* Finally, in examining a provision in the Catawba Tribe Settlement

---

4. The *Shaughnessy* decision was decided just prior to, and was upheld in, *Marcello*. In *Shaughnessy*, the Supreme Court enforced the express repeal requirement of the APA and held that another provision in the INA did not contain sufficient language or history of intent to supersede the APA. 349 U.S. at 51–52, 75 S.Ct. at 593–94.

5. The Tribe cites *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 133, 3 L.Ed. 162 (1810). *Fletcher* states "that one legislature is competent to repeal

any act which a former legislature was competent to pass; and that one legislature cannot abridge the powers of a succeeding legislature." 10 U.S. at 133, 3 L.Ed. 162.

6. Of course, the Gaming Act is the more specific statute as it relates to subject matter. *See Narragansett*, 19 F.3d at 704 n. 21 (arguable whether Gaming Act or Rhode Island Settlement Act is the more specific statute).

Act of 1993, 25 U.S.C. § 941(1)(a), that explicitly exempts the Catawba Tribe from the Gaming Act, the Fifth Circuit found that there was a "clear intention on Congress' part that [the Gaming Act] is not to be the one and only statute addressing the subject of gaming on Indian lands." *Id.* Accordingly, Congress contemplated that some states would be exempt from the Gaming Act's regulatory umbrella.

■ The Tribe's final argument, submitted to the Court by letter following oral argument, and responded to by the Defendants, is that the Court should defer to a determination by the Chairman of the National Indian Gaming Commission that the Gaming Act applies to Maine, and impliedly repeals the Settlement Act to the extent that the two acts conflict. The Court does not agree. The National Indian Gaming Commission's opinion is not binding on the Court. Moreover, one of the purposes of the Commission is to "protect ... gaming as a means of generating tribal revenue." *United Keetoowah Band of Cherokee Indians v. Oklahoma,* 927 F.2d 1170, 1177 (10th Cir.1991) (quoting the Gaming Act, 25 U.S.C. § 2702(3)). Thus the Commission Chairman's opinion "reflects his official responsibility to protect the [Tribes'] financial health a narrowly defined, somewhat adversarial role unlike the more formal and neutral policy-making capacity to which courts generally defer." *Director OWCP v. General Dynamics,* 980 F.2d 74, 79 (1st Cir.1992) (citation omitted). Finally, as the State points out, the Commission opinion is based largely on case law interpretation. An agency chief, however, absent a congressional grant of authority, "has no special expertise ... to interpret case law." *Id.* at 78–79. Accordingly, the Court recognizes, but rejects, the Commission's interpretation of the interplay between the Settlement and Gaming Acts.

The responsibility of this Court is to interpret statutes, not legislate by judicial fiat. If indeed, the interests of the concerned parties are not served by the judicial interpretation of the enacted legislation, the appropriate legislative bodies are legally empowered to revisit the relevant issues.

### III. DISPOSITION

For the reasons stated in this opinion, the Court *GRANTS* the Defendants' Motion for Judgment on the Pleadings.

*SO ORDERED.*